# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### TERRE HAUTE DIVISION

| | | |
|---|---|---|
| MONZER AL-KASSAR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 2:18-cv-00086-JPH-DLP |
| v. | ) | |
| | ) | |
| S. JULIAN, et al. | ) | |
| | ) | |
| Defendants. | ) | |

## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
## FOR PLAINTIFF MONZER AL-KASSAR

Plaintiff Monzer al-Kassar ("Mr. al-Kassar"), by counsel, and pursuant to the Court's

*Minute Entry For September 3, 2020, Pavey Hearing, Hon. James P. Hanlon, District Judge*

(Docket Entry (DE) 181, p. 2), hereby submits the following Proposed Findings of Fact and

Conclusions of Law:

## I.    PROPOSED FINDINGS OF FACTS[1]

### A.    Relevant Background on Mr. al-Kassar

1.    Mr. al-Kassar is and was at all relevant times a federal inmate in the custody

of the federal Bureau of Prisons (BOP), which is a component of the United States Department of

Justice.  (**Ex. 44** (**Joint Stipulated Facts for *Pavey* Hearing** (DE 167) ("**Stipulated Facts**"), ¶ 1**.**)

2.    From December 12, 2011 to October 19, 2016, Mr. al-Kassar was

incarcerated in the Communications Management Unit (CMU) at the Federal Correctional

Institution in Terre Haute, Indiana (FCI – Terre Haute). (**Tr. at 33:22-34: 2 (Schalburg); Ex. 44**

(**Stipulated Facts**), ¶ **8**.)

---

[1] The citations to the transcript of the Pavey hearing and exhibits admitted therein are cited herein as "Tr. at _:_ - _:_ " and "Ex. __."

3.     FCI Terre Haute is one of the three correctional facilities that compose the Federal Correctional Complex in Terre Haute, Indiana (FCC – Terre Haute).  (**Ex. 44** (**Stipulated Facts**), **¶ 9**.)

4.     From September 16, 2016, to October 19, 2016, Mr. al-Kassar was incarcerated in the CMU Special Housing Unit (SHU) at FCI – Terre Haute.  (**Ex. 44** (**Stipulated Facts**), **¶ 18**.)

5.     On October 19, 2016, Mr. al-Kassar was transferred from FCI – Terre Haute to the CMU at the U.S. Penitentiary in Marion, Illinois (USP – Marion).  (**Ex. 44** (**Stipulated Facts**), **¶ 23**.)

B.     **Personnel at FCI – Terre Haute and USP – Marion and facts relevant to the Administrative Remedy Process**

6.     During the time from September 16, 2016 to October 19, 2016, the following individuals held the following positions at FCI – Terre Haute:

a.     Defendant Stephen Julian – Warden (Warden Julian or Julian).  (**Ex. 44** (**Stipulated Facts**), **¶ 19**.)  Warden Julian had no knowledge of handwritten BP 8s and BP 9s being allowed by Ms. Kimberly and utilized in the CMU and CMU SHU at FCI – Terre Haute during the time period of September 16-October 19.  (**Tr. at 151:4-9** (**Julian**).)

b.     Ms. Kimberly – Executive Assistant.  (***Id.* at 97:1-12** (**Swift**).)  Ms. Kimberly's job duties included her serving as the designated Administrative Remedy Coordinator, in which role she directed the forms to be used, or not used, for the Administrative Remedy process.  (***Id.* at 28:16-29:1** (**Schalburg**); *see also* **Ex. 44** (**Stipulated Facts**), **¶ 10**.)

c.     Defendant Clint Swift CMU Case Manager (Swift).  (**Ex. 44** (**Stipulated Facts**), **¶ 20**.)  Mr. Swift's job duties included asking inmates to hand-write, on blank paper, what are typically referred to as requests for informal and formal resolution, which hand-written documents he would attached to the respective BP-8 and/or BP-9 forms that he completed, and providing formal administrative remedy forms (BP-10, and BP-11) to inmates in the FCC – Terre Haute CMU who requested them.  Swift's job duties also included

directing informal and formal resolution requests to the appropriate recipient(s) for a response. (**Tr. at 64:11-24 (Swift**).)

d.    Defendant Evelyn Keller – CMU Intelligence Research Specialist (Keller). Keller's job duties included conducting mail call in the FCC – Terre Haute CMU, which is handing out mail to inmates. When Swift was not available, Keller's job duties during mail call included providing BP-8 forms and BP-9, BP-10, and BP-11 forms to inmates in the FCC – Terre Haute CMU who requested them. When Swift was not available, Keller's job duties during mail call also included collecting completed BP-8 and BP-9 forms from inmates and directing them to the appropriate recipient(s) for a response. (**Ex. 44 (Stipulated Facts**), ¶ **21**.)

e.    Defendant Jeffrey Dobbins – CMU Correctional Officer (Dobbins). (**Ex. 44 (Stipulated Facts**), ¶ **22**.)

f.    Kenneth Robert (Rob) Schalburg – Supervisory Attorney, FCI – Terre Haute/FCC Terre Haute (Schalburg). (**Tr. at 20:25-21:8 (Schalburg**).)

7.    During the relevant time periods on and after October 19, 2016, the following individuals held the following positions at USP – Marion:

a.    Gary Burgess – CMU Case Manager (Burgess). Burgess's job duties included handing requests for BP-8 forms and BP-9, BP-10, and BP-11 forms to inmates in the USP – Marion CMU who requested them. Burgess's job duties also included collecting completed BP-8 and BP-9 forms from inmates and directing them to the appropriate recipient(s) for a response. (**Ex. 44 (Stipulated Facts**), ¶ **24**.)

b.    Kathy Hill – CMU Intelligence Research Specialist (Hill). Hill's job duties included conducting mail call in the USP – Marion CMU. When Burgess was not available, Hill's job duties during mail call included handing requests for BP-8 forms and BP-9, BP-10, and BP-11 forms to inmates in the USP – Marion CMU who requested them. When Burgess was not available, Hill's job duties during mail call also included collecting completed BP-8 and BP-9 forms from inmates and directing them to the appropriate recipient(s) for a response. (**Ex. 44 (Stipulated Facts**), ¶ **25**.)

C.   **Background on Federal Administrative Remedy Program and Mr. al-Kassar's Historical Utilization of the Same Both at FCI – Terre Haute and USP - Marion**

8.   The BOP has promulgated an administrative remedy system, codified at 28 C.F.R. sections 542.10, *et seq.* and BOP Program Statement 1330.18, Administrative Remedy Procedures for Inmates ("P.S. 1330.18") (**Ex. 31**), through which an inmate may seek formal review of a complaint related to any aspect of his imprisonment.  28 C.F.R. § 542.10.  (**Ex. 44** (**Stipulated Facts**), **¶ 2.**)

9.   Defendants introduced no evidence that it provided copies of 28 C.F.R. § 542.10, *et seq.* or P.S. 1330.18 to Mr. al-Kassar.

10.   Pursuant to Institution Supplement Number THX-1330.18A (DEF-000004-DEF-000012), dated January 22, 2016 (**Ex. 30**), "The Executive Assistant is the designated Administrative Remedy Coordinator."  (Id. at DEF-000004-DEF-000005, ¶ IV.)  "It shall be the practice at FCC Terre Haute to informally resolve inmate complaints whenever possible.  Inmates will present their complaints verbally to their unit team, ordinarily the correctional counselor.  ***In the absence of the correctional counselor, inmates will be permitted to present their issue to any staff member assigned to their unit team***."  (Id. at DEF-000005, ¶ V.A. (emphasis added).)  (**Ex. 44** (**Stipulated Facts**), **¶ 10.**)  Here, as noted above, Ms. Kimberly was the Executive Assistant, i.e., the designated Administrative Remedy Coordinator, the person in charge of the administrative remedies process at FCI – Terre Haute at all times relevant to this case.  (**Tr. at 28:16-29:1** (**Schalburg**).)

11.   Pursuant to P.S. 1330.18 (**Ex. 31**), in the September 2016 – October 2016 time period, Warden Julian, as the warden at FCI – Terre Haute, was responsible for ensuring that effective informal resolution procedures were in place and that good faith attempts at informal

- 4 -

resolution were made in the ordinary and timely manner by both inmates and staff at FCI – Terre Haute.  (*Id*. **at 144:18-145:9 (Julian)**.)

        12.     In the September 2016 – October 2016 time period, the FCI – Terre Haute CMU SHU had a unit team that handled administrative remedies, which team consisted of the Unit Manager (Mr. Sample), the Case Manager/Counselor (Defendant Clint Swift), and the Intelligence Research Specialist (Defendant Evelyn Keller).  (*Id.* **at 64:25-65:19 (Swift)**.)  All of these positions/individuals were considered staff members in the FCI – Terre Haute CMU.  Correctional Officers, such as Defendant Jeffrey Dobbins, was also considered a staff member at FCI – Terre Haute, but not a member of the FCI – Terre Haute CMU unit team.  (*Id.* **at 87:9-16 and 88:4-8**.)

        13.     According to Swift and Dobbins, and contrary to the Institution Supplement Number THX-1330.18A (**Ex. 30**) quoted above, inmates in the FCI – Terre Haute CMU were required to advise a member of the unit team of his desire to make a complaint, and could not raise such complaints to staff members as allowed under **Ex. 30**, which request began with an informal resolution request (BP 8), followed by the submission of a formal administrative complaint, via a BP 9.  (*Id.* **at 67:11-68:23 and 70:9-18 (Swift) and 104:15-20 (Dobbins)**.)  Dobbins went so far as to actually testify that he would refuse to take/accept an administrative remedy request or letter to the Warden from an inmate—a refusal directly contrary to BOP regulations and the FCI – Terre Haute Institution Supplement in place in September/October 2016.  (*Id.* **at 105:8-106:3 (Dobbins)**.)

        14.     P.S. 1330.18, ¶ 8(c)(1) (**Ex. 31**) states:  "The inmate shall obtain the appropriate form from CCC staff or institution staff (ordinarily, the correctional counselor)."  P.S. 1330.18, ¶ 8(c)(2) states:  "The inmate shall place a single complaint or a reasonable number of closely related issues on the form.  If the inmate includes on a single form multiple unrelated

issues, the submission shall be rejected and returned without response, and the inmate shall be advised to use a separate form for each unrelated issue." (**Ex. 44** (**Stipulated Facts**), ¶ **7**.)

15.     Contrary to P.S. 1330.18, ¶ 8(c)(1) (**Ex. 31**), in September/October 2016, inmates in the FCI Terre Haute CMU and CMU SHU were not given forms to be completed; rather, they hand wrote their complaints and members of the unit team were to complete the appropriate forms. (**Tr. at 67:23-69:8, 76:14-77:2 and 86:5-87:4 (Swift) and 191:8-21 (al-Kassar)**.) Swift specifically advised al-Kassar that he must handwrite BP 8s. (***Id.* at 191:19-21 (al-Kassar)**.)

16.     Defendants introduced no evidence that it advised Plaintiff of the requirements of P.S. 1330.18, ¶¶ 8(c)(1) and (c)(2).

17.     To exhaust his remedies, pursuant to 28 C.F.R. § 542.13(a), "an inmate shall first present an issue of concern informally to staff, and staff shall attempt to informally resolve the issue before an inmate submits a Request for Administrative Remedy. Each warden shall establish procedures to allow for the informal resolution of inmates complaints." P.S. 1330.18 at 4 (¶ 7.a.). (**Ex. 44** (**Stipulated Facts**), ¶ **3**.)

18.     FCI – Terre Haute, typically, utilizes a form called a BP 8 for the Informal Resolution Process. (**Ex. 44** (**Stipulated Facts**), ¶ **3**.)

19.     Neither 28 C.F.R. § 542.10, *et seq*., nor P.S. 1330.18 (**Ex. 31**) nor THX-1330.18A (**Ex. 30**) makes any reference to a BP 8 form or document. (**Tr. at 56:13-57:10 (Schalburg)**.)

20.     The "informal resolution attempt may be waived in individual cases at the Warden or institution Administrative Remedy Coordinator's discretion when the inmate

demonstrates an acceptable reason for bypassing informal resolution."  28 C.F.R. § 542.13(b).

(**Ex. 44** (**Stipulated Facts**), ¶ **3**.)

21.  *If*  Defendants are found to have followed the applicable regulations and

P.S. 1330.18, according to the applicable regulations and P.S. 1330.18, an inmate who is

dissatisfied with the result of his attempt at informal resolution or wishes to bypass informal

resolution may submit "the appropriate form (BP-9)" to "the institution staff member designated

to receive such Requests (ordinarily a correctional counselor)" within 20 calendar days of the

incident giving rise to the request. 28 C.F.R. § 542.14(a); P.S. 1330.18 at 4.  (**Ex. 44** (**Stipulated**

**Facts**), ¶ **4**.)

22.  An inmate at FCI – Terre Haute has twenty (20) days following the date of

an incident he is complaining about to submit his complaint, commonly referred to as a BP 9 at

FCI – Terre Haute.  (**Tr. at 22:7-8 (Schalburg) and Ex. 31**.)

23.  Although Schalburg testified that the BOP views hospitalization of an

inmate, and other forms of incapacity of the inmate as good cause for a delay in submitting an

administrative complaint (***Id.* at 24:1-10**), he and all other witnesses did not even consider a BOP

official's refusal to process/accept an administrative complaint as good cause, boldly claiming that

such a refusal to process/accept would not occur.  (**Tr. at 27:8-10 (Schalburg)**.)  Schalburg

testified that no BOP personnel have ever been disciplined for a failure to give an inmate a BP 8

or BP 9 as they always provide such forms.  (***Id.* at 60:21-24**.)  Such perfection defies logic.

Common sense dictates that some errors and refusals may occur.  In light of FCI – Terre Haute's

record of never disciplining a BOP employee for refusing to process administrative complaints, it

stands reasonable to presume that such refusals to process have occurred since doing so has not

rendered anyone at FCI – Terre Haute subject to discipline.

24.      An inmate at FCI – Terre Haute may only cure an untimely submission of an administrative complaint, a BP 9, if he can obtain staff verification by memo or some writing that the reason for untimeliness is not his fault.  (**Tr. at 23:9-25 (Schalburg)**.)

25.      Generally, although the BOP collects information related to the substance of BP 9 administrative complaints from subject matter experts, the warden at a BOP facility signs responses to BP 9 administrative complaints.  (***Id.* at 24:15-21**.)

26.      ***If*** Defendants are found to have followed the applicable regulations and P.S. 1330.18, according to the applicable regulations and P.S. 1330.18, if an inmate is dissatisfied with the response to his BP-9, he may appeal to the Regional Director by submitting a form BP-10 to the appropriate Regional Office "within 20 calendar days of the date the Warden signed the response" to the BP-9.  28 C.F.R. § 542.15(a); P.S. 1330.18 at 6–7.  (**Ex. 44 (Stipulated Facts)**, ¶ **5;** *see also*, **Tr. at 24:22-25:5 (Schalburg)**.)

27.      ***If*** Defendants are found to have followed the applicable regulations and P.S. 1330.18,  according to the applicable regulations and P.S. 1330.18, if an inmate is dissatisfied with the Regional Director's response to his BP-10, he may appeal to the General Counsel by submitting a form BP-11 by mail to the BOP Central Office "within 30 calendar days of the date the Regional Director signed the response."  28 C.F.R. § 542.15(a); P.S. 1330.18 at 7.  (**Ex. 44 (Stipulated Facts)**, ¶ **6;** *see also*, **Tr. at 25:6-11 (Schalburg)**.)

**D.      The Administrative Remedy Process at FCI Terre Haute During the September and October 2016 Time Period**

28.      During the September 16, 2016 to October 19, 2016 time period, the FCI – Terre Haute CMU unit team ***never*** left BP 8 forms with inmates.  (**Tr. at 68:25-69:1 (Swift)**.) Rather, in the September/October 2016 time period, and per the instructions and direction of Ms. Kimberly, FCI – Terre Haute did not utilize or follow the process or requirements articulated in

- 8 -

P.S. 1330.18, ¶¶ 8(c)(1) or (c)(2) with regards to BP 8s or BP 9s.  Rather, inmates were asked to

hand write BP 8 and BP 9s (*Id.* **at 86:5-87:4 and 97:1-98:1 (Swift)**),[2] which forms Swift would

usually either throw away and not process or attach to BP 8 and BP 9 forms for processing.  (*Id.*

**at 192:4-7 (al-Kassar)** (because the Court found Mr. al-Kassar's testimony that he provided **Exs.**

**9-11** to BOP personnel credible, the Court concludes that Swift failed to process and/or threw

away, thereby not processing, **Exs. 9-11**, documents that Mr. al-Kassar attempted to submit as BP

8s and/or BP 9s.)  Related, FCI – Terre Haute has received complaints from inmates about staff

refusing to give them BP 8 and BP 9 forms.  (**Tr. at 60:13-20 (Schalburg)**.)  Defendants submitted

testimony from Schalburg that during his entire tenure at FCI – Terre Haute, which covers the

relevant time period in this case, FCI – Terre Haute never accepted handwritten BP 9

administrative complaints.  (**Tr. at 58:17-59:2 (Schalburg)**.)  As FCI – Terre Haute did in fact

receive handwritten BP 8s and BP 9s as testified to by Swift, the Court does not find Schalburg's

testimony on this topic persuasive on any genuine issue of material fact in this case.

29.     During September and October 2016, Clint Swift ("Swift") was a case

manager in the FCI – Terre Haute CMU SHU. **(Tr. at 63:6-9 (Swift))**. During this timeframe and

at FCI – Terre Haute CMU SHU, The BOP's administrative remedy program, utilized a form

called a BP 8 for the informal resolution process. **(Tr. at 29:9-12 (Schalburg))**.

30.     Despite Schauburg's testimony that BP 9s had to be written "on an official

form of some kind" **(Tr. at 24:11-14 (Schalburg)**), during September and October of 2016, BOP

staff in the FCI – Terre Haute CMU SHU, per Ms. Kimberly's directive, requested that inmates

handwrite their administrative complaints on a piece of paper, which handwritten documents FCI

– Terre Haute considered to be acceptable BP 8 and BP 9 administrative complaints, and turn it in

---

[2] According to Swift, Ms. Kimberly's directive for handwritten BP 8s and BP 9s continued at FCI – Terre Haute until
at least December 2018.  (**Tr. at 98:2-9 (Swift)**.)

to any member of the unit team. **(Tr. at 29:12-17 (Schalburg); Tr. at 86:5-19 (Swift); Tr. at 273:19-274:4(Rendelman))**.  Inmate Scott Rendelman (Rendelman) testified that in the relevant time period for this case, Swift, in addition to having a policy of BP 8s and 9s be handwritten on separate paper by inmates, also had a practice of throwing out or not processing/submitting inmates' administrative complaints.  **(Tr. at 274:5-275:10 (Rendelman).)**

31.     More specifically, the practice at FCI – Terre Haute CMU SHU, was for members of the unit team to ask to write an inmate's complaint on the BP 9 form if it was a short complaint.  **(Tr. at 97:9-20 (Swift))**.  If the inmate's grievance was lengthy, the inmate was instructed to write the complaint on a piece of paper. *Id.*

32.     Furthermore, an inmate did not have to specifically ask for a BP 8 form to initiate the informal resolution process.  **(Tr. at 91:3-17 (Swift))**.  It was sufficient for an inmate to request an administrative remedy or say that they have an administrative complaint. *Id*. There had been some instances at FCI – Terre Haute CMU SHU where inmates complained to staff at the unit team about failing to provide them BP 8s or BP 9s. **(Tr. at 60:13-20 (Schalburg))**.The BOP required inmates to engage and utilize the informal resolution process prior to invoking the formal remedy process. **(Tr. at 29:12-17(Schalburg))**. The first step of the formal resolution process begins with the filing of a BP 9 form. **(Tr. at 23:4-5 (Schalburg))**. The BOP's administrative remedy coordinator had discretion to allow inmates to bypass the BP 8 informal resolution attempt and submit a BP 9 formal request. **(Tr. at 31:21-25, 32:1-2 (Schalburg))**.

**E.      Mr. al-Kassar's Efforts to Timely Initiate the Administrative Process at FCI  - Terre Haute and USP Marion in the September, October and November 2016 Time Period**

33.     During the time period of 2012 – February 20, 2015, Mr. al-Kassar submitted numerous BP 9s utilizing the forms provided at FCI – Terre Haute.  **(Tr. at 35:5-16,**

**37:2-44:10 and 57:11-24 (Schalburg)**; *see also*, **Exs. 34-40, 43 and 44 (Stipulated Facts, ¶¶ 11-17)**.)

34. Swift initially testified that he did not consider "letters" to be BP 8s.  (**Tr. at 69:9-24 (Swift)**.)  Despite this testimony, and to the contrary, he later testified that he considered page 4 of Ex. 40, a document that appears to be a handwritten letter, an appropriate BP 8.  (*Id.* at **79:10-80:9**.)

35. FCI – Terre Haute does not have any record of BP 9s being submitted by Mr. al-Kassar during the time period of February 21, 2015, through his transfer to USP – Marion on October 19, 2016.  (*Id.*)

36. The Court finds that Mr. al-Kassar made repeated timely efforts to initiate the administrative remedy process with respect to his *Bivens* claims, first at FCI – Terre Haute and then at USP Marion.

37. The Court finds that when Mr. al-Kassar requested BP 8 or BP 9 forms from Swift in September and October 2016, Swift refused to give the same to him.  (**Tr. at 193:1-6, 195:10-15 and 198:20-24 (al-Kassar)**.)  The Court makes these factual findings based upon the testimony of Mr. al-Kassar and Swift, reconciling differences in the same and making credibility determinations.

38. Mr. al-Kassar testified that on or about September 21, 2016, he handwrote on a piece of paper, a letter addressed to the Warden, Stephen D. Julian ("the Warden") (**Ex. 9**) making several complaints regarding the conditions of his confinement.  (**Tr. at 192:14-194:12 (al-Kassar)**.)  Dobbins testified that he observed Mr. al-Kassar handing documents to Swift and that he cannot definitively state what Swift did with those documents.  (*Id.* at **109:3-8 and 112:4-19 (Dobbins)**.)  Swift testified in direct contradiction to Mr. al-Kassar's testimony, stating that

- 11 -

Mr. al-Kassar never provided **Ex. 9** to him and that he had never seen **Ex. 9** prior to his deposition in this case.  (***Id.* at 88:9-25 (Swift)**.)  Per the impeachment of Swift, had **Ex. 9** been handed to Swift, it could have been considered a BP 8.  (***Id.* at 89:6-90:11** and **Ex. 45**.)  Although Swift testified that an inmate must specifically say "I wish to submit a BP 8," the Court does not find that credible as the term BP 8 appears nowhere in the BOP regulations or institution supplement. (***Id.* at 90:16-91:17** and **Ex. 45**.)  Warden Julian testified that he neither received nor saw **Ex. 9** prior to his deposition in this case.  (***Id.* at 143:13-16 and 148:20-24 (Julian)**.)  There exists no evidence contradicting this fact.  Warden Julian testified that if Ex. 9 had been handed to any member of the unit team in September 2016, it should have been delivered to him.  (***Id.* at 149:3-7**.)  In light of the policy at that time, *i.e.*, inmates handwriting of BP 8 and BP 9 forms, which policy Warden Julian did not even know existed at the time, and Swift's testimony that he accepted letters as administrative complaints, the Court finds Mr. al-Kassar's testimony more credible and finds that Mr. al-Kassar did in fact deliver **Ex. 9** to Swift, and that **Ex. 9** was clearly an attempt at submitting a BP 8 at FCI Terre Haute.  As **Ex. 9** did not end up in Mr. al-Kassar's file at FCI – Terre Haute, and was never routed to Warden Julian, the Court further finds that Swift either destroyed or failed to process **Ex. 9** as an administrative complaint by Mr. al-Kassar, which action stands contrary to BOP regulations and the FCI – Terre Haute practice regarding administrative complaints at the time.

      39.     Mr. al-Kassar testified that on or about September 29, 2016, he again, handwrote on a piece of paper, a letter addressed to the Warden (**Ex. 10**), making additional complaints concerning the conditions of his confinement.  (**Tr. at 194:20-196:9 (al-Kassar)**.)  Mr. al-Kassar further testified that he gave the original of **Ex. 10** to Dobbins and kept a second copy for himself.  Mr. al-Kassar wrote the note found in the bottom left hand corner of **Ex. 10** ("This

- 12 -

BP 9 was handed over to the C.O. Mr. Dobbins at 3:19 p.m. in front of the camera.  Thursday, 09/29/2016.")  (*Id.* **at 195:4-9 and 232:3-10.**)  Swift testified that he has "no reason" "to dispute Mr. al-Kassar's memory and testimony."  (*Id.* **at 93:10-17 (Swift)**.)  As noted above, it is proper for a BP 9 to be provide to a staff member, which Dobbins was at that time.  Dobbins testified in direct contradiction to Mr. al-Kassar's testimony, stating that Mr. al-Kassar never provided **Ex. 10** to him and that he had never seen **Ex. 10** prior to his deposition in this case.  (*Id.* **at 108:4-8 and 113:2-114:3 (Dobbins)**.)  The video of the area where Mr. al-Kassar would have handed **Ex. 10** to Dobbins no longer exists.  (*Id.* **at 113:17-19**.)[3]  Dobbins admitted that the statement in his affidavit (**Ex. 21**) that he did not take documents from inmates in the CMU SHU at FCI – Terre Haute was incorrect.  Dobbins did in fact take documents from inmates.  (*Id.* **at 114:4-115:11**.)  Although Dobbins testified that his typical working hours in September/October 2016 were Monday-Friday, 7:00 a.m. – 3:00 p.m. (*Id.* **at 104:2-6**), the same fails to definitely refute Mr. al-Kassar's claim and documentation that he provided **Ex. 10** to Dobbins on September 29, 2016, at 3:19 p.m.  Neither party presented any time punch/time clock evidence of Dobbins' actual hours worked on September 29, 2016.  Dobbins did testify that he ended every single shift that he worked in September and October 2016 exactly at 3:00 p.m.  (*Id.* **at 115:19-21**.)  This Court does not find it credible that a correctional office ends every single shift at the exact time on every shift for two straights months without documentary and time punch evidence of the same.  Swift testified that he never saw **Ex. 10** prior to his deposition in this case.  (*Id.* **at 93:6-9 (Swift)**.)  Warden Julian testified that he neither received nor saw **Ex. 10** prior to his deposition in this case.  (*Id.* **at 149:8-14 (Julian)**.)  There exists no evidence contradicting this fact.  In light of the policy at that time,

---

[3] According to the testimony from Keller, audio and video recordings of all CMU cells at FCI – Terre Haute are held on the system for twenty-one (21) days unless permanently saved to the hard drive.  To be permanently saved to the hard drive, it would need to be a situation that necessitates the same, such as an altercation, an internal request for such preservation or an order from a court.  (**Tr. at 118:14-119:10**.)

*i.e.*, inmates handwriting of BP 8 and BP 9 forms, which policy Warden Julian did not even know existed at the time, and Swift's testimony that he accepted letters as administrative complaints, the Court finds Mr. al-Kassar's testimony more credible and finds that Mr. al-Kassar did in fact deliver **Ex. 10** to Dobbins, and that **Ex. 10** was clearly an attempt at submitting a BP 9 at FCI Terre Haute. As **Ex. 10** did not end up in Mr. al-Kassar's file at FCI – Terre Haute, and was never routed to Warden Julian, the Court further finds that Swift and/or Dobbins either destroyed or failed to process **Ex. 10** as an administrative complaint by Mr. al-Kassar, which action stands contrary to BOP regulations and the FCI – Terre Haute practice regarding administrative complaints at the time.

40.     On October 6, 2016, Mr. al-Kassar wrote a letter (**Ex. 24**) to his human rights attorney in Paris, Ms. Isabell Coutant Peyre.  In this letter, Mr. al-Kassar makes references to his two (2) September 2016 letters to Warden Julian (which is a clear reference to **Exs. 9 and 10** herein) and that he had yet to receive a response to either letter.  (**Tr. at 203:20-205:11 (al-Kassar**).)  The Court finds this evidence to be credible and support of Mr. al-Kassar's claim that he handed **Exs. 9 and 10** to BOP personnel.

41.     In addition, to those two written administrative complaints/grievances (**Exs. 9 and 10**), Mr. al-Kassar testified that he addressed another handwritten letter (**Ex. 11**) to the Warden on October 10, 2016, complaining about the conditions of his confinement and that he handed the same to Swift on or about October 10, 2016.  (**Tr. at 195:22-196:16 (al-Kassar**).)  Mr. al-Kassar says that he gave **Ex. 11** to BOP personnel on October 10, 2016, or shortly thereafter.  (*Id***. at 198:3-12 and 232:11-21 (al-Kassar**).)  Swift testified in direct contradiction to Mr. al-Kassar's testimony, stating that Mr. al-Kassar never provided **Ex. 11** to him and that he had never seen **Ex. 11** prior to his deposition in this case.  (*Id***. at 88:9-25 (Swift**).)  Swift's testimony that he

- 14 -

was on vacation from October 6-10, 2016, fails to negate Mr. al-Kassar's testimony that he created Ex. 11 or that he provided the same to him (Swift) sometime between October 11, 2016, and his transfer to USP Marion on October 19, 2016.  ( *See Id.* **at 65:25-6612 (Swift) and** *infra,* **¶¶ 42 and 43**.)  In light of the policy at that time, *i.e.*, inmates handwriting of BP 8 and BP 9 forms, which policy Warden Julian did not even know existed at the time, and Swift's testimony that he accepted letters as administrative complaints, the Court finds Mr. al-Kassar's testimony more credible and finds that Mr. al-Kassar did in fact deliver **Ex. 11** to Swift, and that **Ex. 11** was clearly an attempt at submitting a BP 9 at FCI Terre Haute.  As a version of **Ex. 11** ended up in Mr. al-Kassar's file at FCI – Terre Haute, and was never specifically routed to Warden Julian, the Court further finds that Swift and/or other BOP personnel at FCI – Terre Haute failed to process **Ex. 11** as an administrative complaint by Mr. al-Kassar, which action stands contrary to BOP regulations and the FCI – Terre Haute practice regarding administrative complaints at the time.

42.     Mr. al-Kassar testified that he did not put **Exs. 9, 10 or 11** on pre-printed forms because said forms were never given to him in September/October 2016.  (**Tr. at 198:20-199:2 and 211:19-212:15 (al-Kassar)**.)

43.     Mr. al-Kassar testified that he did not receive a response to **Exs. 9, 10 or 11**.  (**Tr. at 194:13-19, 195:16-19 (al-Kassar)**.)

44.     While in the FCI – Terre Haute CMU SHU, on October 17, 2016, Mr. al-Kassar wrote a letter to his attorney, Ms. Gail.  In his letter, Mr. al-Kassar made reference to three (3) letters – he was referring to **Exs. 9-11**.  (**Tr. at 199:3-200:8 (al-Kassar)**.)

45.     **Ex. 42**, a document similar to **Ex. 6**, page 11, and **Ex. 11**, and virtually identical in substance to these documents, was scanned to Mr. al-Kassar's file at FCI – Terre Haute on October 21, 2016.  (**Tr. at 81:21-82:19 (Swift) and 126:6-127:4 (Keller)**.)  Defendants'

I\15769725.4

witnesses had no knowledge of who it was that scanned this into Mr. al-Kassar's electronic file. (*Id*.)   According to Swift and Keller, **Ex. 42** could have been handed to BOP personnel or confiscated from Mr. al-Kassar's cell/belongings.   (*Id*. **at 94:18-95:16 (Swift) and 127:8-17 (Keller)**.)   Regardless of how FCI – Terre Haute obtained possession of **Ex. 42** (or **Ex. 11** as the Court finds that Mr. al-Kassar provided the same to Swift), according to Swift, it should have been directed to Warden Julian for a response (*Id*. **at 95:17-20 (Swift)**), which Warden Julian testified did not happen.  (*Id*. **at 150:6-22 (Julian)**.)

      46.    Mr. al-Kassar testified as follows regarding **Exs. 6 and 11 v. 42:**

Q:    … There has been a question raised because we have some differences.  If you look at Exhibit 11 and Exhibit 42 and Exhibit 6, unfortunately, it's in the middle of Exhibit 6, but they appear to be three documents, but they're not identical. There are some minor differences between what is found in Exhibit 6 at Page 11 of 38 and what is Exhibit 11 and what is Exhibit 42.  Can you explain why there are so many differences in the text between the versions.

A:    Well, here somebody is lying.  Definitely not me.  Because the Exhibit 42 was written in a nice way, because I'm addressing Mr. Julian.  It has to be clear.  But if you go to number 6, you see it's a bit different.  I have made number 6[, 11] and number 42.  So my understanding from the – from today's hearing that they say 42 was found in the system.  So what was in the system?  If it's really as Ms. Keller said, or my understanding she said, I left some papers when they removed me, so if that is true, there should be number 6 there, not number 42, unless I am invisible and I went to the system and I put it there.  So someone is lying here.  How did this number 42 get into the system?  It's not for me to answer.

Q:    So, Monzer, if I understand your testimony correctly you made different versions of this.  You handwrote different versions.  And so which of these was the version that you submitted or attempted to – that you submitted?  Was it 42, since the handwriting is a little bit better?  Which is it?

A.    No, no, no.  The 42 is the original one.  The other one copy, . . .

- 16 -

**(Tr. at 196:17-197:19 (al-Kassar).)**

47.     On October 19, 2016, Mr. al-Kassar was transferred to the CMU SHU at USP – Marion.  (**Ex. 44 (Stipulated Facts), ¶ 23**.)

48.     During the time from October 19, 2016, to February 26, 2018, Hill was an intelligence research specialist at USP – Marion. **(Tr. at 154: 2-8 (Hill))**.  Hill, alone, handled Mr. al-Kassar's initial intake when he arrived at USP – Marion, which process took around fifteen (15) -  thirty (30) minutes.  (***Id*. at 155:13-22 and 159:24-160:1 (Hill) and 187:14-21 (Burgess)**.) During the intake process, according to Hill, Mr. al-Kassar began telling Hill about his time at FCI – Terre Haute and his complaints there.  Hill testified that she "cut him off pretty short and said, …, you are not at Terre Haute anymore, you are at Marion, let's start fresh here." (***Id*. at 159:4-16 (Hill)**.)  Mr. al-Kassar stopped his complaints regarding FCI – Terre Haute and Hill complete the initial intake paperwork with Mr. al-Kassar.  (***Id.***)  Hill failed to offer Mr. al-Kassar a BP 8 during his USP – Marion intake process.  (***Id*. at 169:22-24**.)

49.     On direct examination by Defendants' counsel, Hill claims that she provided Mr. al-Kassar with an "A and O handbook" during intake.  (***Id*. at 159:17-19 (Hill)**.)  On cross examination by Plaintiff's counsel, Hill affirmed that she failed to advise Plaintiff's counsel during her deposition in this case that she allegedly provided Mr. al-Kassar with a copy of the "A and O handbook" and that her deposition testimony regarding the initial intake meeting, which made no mention of giving Mr. al-Kassar an A and O handbook, covered all that happened.  (***Id*. at 166:22-167:5***.)  Mr. al-Kassar testified that at no time during her incarceration at USP – Marion has Hill provided him an A and O handbook for USP – Marion.  (***Id*. at 218:6-11 (al-Kassar)**.) The Court finds Hill's testimony at the Pavey hearing regarding her providing Mr. al-Kassar with a copy of the A and O handbook lacks credibility and finds that she did not do so.

- 17 -

50.     Mr. al-Kassar testified that a few days after transfer to USP-Marion, he attempted to raise his FCI – Terre Haute CMU SHU administrative complaints/grievances with Hill during mail call.  **(Tr. at 217:4-218:5 (al-Kassar))**.  Mr. al-Kassar testified that Hill responded that Mr. al-Kassar was now in a different state and facility and that he should have handled his FCI – Terre Haute CMU SHU administrative complaints at that facility.  (***Id.***)  Burgess was not present that day.  (***Id.* at 188:15-18 (Burgess)**.)  Although on direct Hill testified in direct contradiction to Mr. al-Kassar's testimony, she did testify on cross examination that it was possible that such conversation with Mr. al-Kassar occurred.  (***Id.* at 161:25-162:5 and 167:20-168:2 (Hill)**.)  Mr. al-Kassar's testimony stands supported by the testimony of USP – Marion inmates Reginald Falice (Falice) and Hosam al-Smadi (al-Smadi).  **(Tr. at 250:22-254:15 (Falice) and 261:17:262:14 (al-Smadi)**.)  This Court finds Mr. al-Kassar's versions of events related to his mail call interaction with Hill credible and that Hill simply did not recall the event.  Additionally, the Court finds that this communication, combined with the fact that Mr. al-Kassar did not receive a copy of the A and O handbook, and that Mr. al-Kassar was "in a bad condition" upon his arrival at USP – Marion at the time of his early mail room interaction with Hill (**Tr. at 261:17-262:14**) left the impression on Mr. al-Kassar that he could not make his FCI – Terre Haute CMU SHU torture complaints at USP – Marion.  **(Tr. at 221: 5-15 (al-Kassar))**.

51.     While at USP – Marion, Mr. al-Kassar e-mailed Hill via the prison's TRULINCS system (non-admitted **Ex. 22**) related to missing legal documents.  (**Tr. at 221:16-222:18 (al-Kassar)**.)

52.     On November 17, 2016, Mr. al-Kassar e-mailed Hill via the prison's TRULINCS system (non-admitted **Ex. 12**) and asked her to forward said e-mail to Swift at FCI –

Terre.  (**Tr. at 222:19-223:2 (al-Kassar)**).  Swift never received a forwarded e-mail by Hill from Mr. al-Kassar.  (**Tr. at 96:1-16 (Swift)**.)

53.     USP – Marion has record of BP 9s being submitted by Mr Al-Kassar on and after November 26, 2016.  (**Tr. at 44:11-46:12 and 57:25-58:3 (Schalburg**); *see also*, **Exs. 3, 4 and 44 (Stipulated Facts), ¶¶26-27**.)  One of those BP 9s, **Ex. 3**, relates to Mr. al-Kassar's mail issues that carried over from FCI – Terre Haute to USP – Marion.  Mr. al-Kassar filed this complaint in early November 2016, and not ones related to his torture at FCI – Terre Haute because that was what someone told him he could do.  (**Tr. at 219:12-221:4 and 233:8-17 (al-Kassar)**.)

54.     In February 2017, Mr. al-Kassar submitted administrative claims at USP Marion related to his torture at FCI – Terre Haute.  (***See* Ex. 4,** which is basically the same complaints found in **Exs. 9-11.**)  (T**r. at 181:23-186:4 (Burgess) and 226-228 (al-Kassar)** and **Exs. 4, 5** and **43.**)

55.     Mr. al-Kassar testified that he filed this at USP – Marion because by that point he realized he could do so, e.g., Mr. al-Kassar testified that he submitted this administrative complaint once he understood that he could do so.  He received this knowledge, not from BOP personnel, but fellow inmates.  (**Tr. at 223:23-224:2 (al-Kassar)**).

56.     Mr. al-Kassar testified that he did not file these complaints/grievances (BP 8s or BP 9s) during his first few months at USP – Marion due to concern about his health and because Hill told him he could not do it.  (***Id.* at 224:3-6**.)

57.     Defendants counsel submitted evidence via testimony elicited from Mr. al-Kassar that he did not include in his February 2017 BP 9 and subsequent submissions (**Ex. 4**) anything about not having access to administrative remedy forms.  (**Tr. at 234:5-238:17 (al-Kassar)**.)  Although this fact stands undisputed, it holds no relevance to this case.  As testified to

- 19 -

by Swift, the "forms" were not used for BP 8s and BP 9s in the relevant time period, September/October 2016.  Rather, inmates like Mr. al-Kassar were asked to handwrite out their complaints.  Thus, this Court does not find it relevant or surprising that Mr. al-Kassar's submissions in February 2017 (**Ex. 4**) did not include a reference or allegation related to not having access to administrative remedy forms.  FCI – Terre Haute did not have inmates handle such forms and, thus, access is a not an issue Mr. al-Kassar would be expected to complain of in this case.

58.     Mr. al-Kassar testified that he did not seek to obtain a letter or memo excusing the late file at USP – Marion because he reasonably thought at that point that it would be futile..  (**Tr. at 227:1-20 (al-Kassar)**.)

59.     These findings of fact shall include any conclusion of law which is a finding of fact.

## II.     PROPOSED CONCLUSIONS OF LAW

1.     Pursuant to § 1997e(a) of the Prison Litigation Reform Act (PLRA) an inmate cannot file a *Bivens* lawsuit "until such administrative remedies *as available* are exhausted." 42 U.S.C. § 1997e(a) (emphasis added); *Dale v. Lappin*, 376 F.3d 652, 655 (7th Cir. 2004).

2.     The Supreme Court has held that the failure to satisfy this exhaustion requirement is an affirmative defense.  *See Pavey v. Conley*, 544 F.3d 739, 741 (7th Cir. 2008) (*citing Jones v. Bock*, 549 U.S. 1999 (2007)).

3.     The burden is on Defendants to prove (1) that the administrative remedy was available, and (2) that the plaintiff failed to pursue it.  *See Thomas v. Reese*, 787 F.3d 845, 847 (7th Cir. 2015) (*citing Jones v. Bock*, 549 U.S. 199 (2007); *Pavey v. Conley*, 663 F.3d 899, 903 (7th Cir. 2011)).

- 20 -

I\15769725.4

4.      In *Pavey*, the Seventh Circuit outlined the procedure to be followed in a case which exhaustion is contested:

> (1) The district judge conducts a hearing on exhaustion and permits whatever discovery relating to exhaustion he deems appropriate. (2) If the judge determines that the prisoner did not exhaust his administrative remedies, the judge will then determine whether (a) the plaintiff has failed to exhaust his administrative remedies . . . (b) or, although he has not exhausted administrative remedies, the failure to exhaust was innocent (as where prison officials prevent a prisoner from exhausting his remedies), and so he must be given another chance to exhaust . . .; or (c) the failure to exhaust was the prisoner's fault, in which event the case is over.  (3) If and when the judge determines that the prisoner has properly exhausted his administrative remedies, the case will proceed to pretrial discovery, and if necessary a trial, on the merits.

*Pavey*, 544 F.3d at 742.

5.      If administrative remedies are available, the PLRA requires inmates to follow the prison's administrative process to request them, including filing grievances at the time and in the place specified by the prison's policy.  *Pyles v. Nwaobasi*, 829 F.3d 860, 864 (7th Cir. 2016).

6.      The process, however, must be available before exhaustion is required; if the remedies are unavailable, the PLRA excuses compliance with the prison's grievance process. *Id*. Thus, if administrative remedies are unavailable, "the prisoner is considered to have exhausted" them. *Id*.

7.      A remedy is deemed unavailable if prison employees do not respond to a properly filed grievance or otherwise use affirmative misconduct to prevent a prisoner from exhausting. *Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006).  Furthermore, "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation," the process is not available." *Ross v. Blake*, 136 S. Ct. 1850, 1860 (2016).

- 21 -

8.      Here, the Defendants have failed to meet their burden to demonstrate that the administrative remedies were available to Mr. al-Kassar.  Thus, as a matter of law, Mr. al-Kassar is considered to have exhausted them in accordance with *Pavey and Pyles*.

9.      During the relevant timeframe at issue here (September 2016 – October 2016), Mr. al-Kassar presented no fewer than three (3) handwritten complaints (**Exs. 9-11**), following the FCI – Terre Haute practice at that time, concerning the filing of administrative remedies related to his confinement conditions in the FCI- Terre Haute CMU SHU.

10.     As a matter of law, FCI – Terre Haute failed to follow P.S. 1330.18's requirement to use BOP forms for administrative complaints.

11.     As a matter of law, and pursuant to Institution Supplement Number THX-1330.18A (DEF-000004-DEF-000012), dated January 22, 2016 (**Ex. 30**), Ms. Kimberly, as the duly "designated Administrative Remedy Coordinator" at FCI – Terre Haute during September and October 2016, permitted inmates to present their administrative remedy complaints to their unit team, ordinarily the correctional counselor, and, in ***the absence of the correctional counselor, to any staff member assigned to their unit team, which include correctional officers such as Dobbins.***

12.     As a matter of law, Mr. al-Kassar's failure to turn in complaints on BOP pre-printed forms was an error on the part of BOP personnel, Swift in particular, not Mr. Al-Kassar.   Mr. al-Kassar is found, as a matter of law, to have attempted to submit his administrative complaints via his submission of **Exs. 9-11** as noted above.

13.     Mr. al-Kassar's actions of submitting these handwritten documents, be they considered BP 8s or BP 9s, complied with FCI – Terre Haute's then existing policy per the directives of Ms. Kimberly, the person responsible for setting forth said policies.

14.     BOP employees Swift and Schalburg both testified that inmates were requested to handwrite their BP 8 complaints to initiate the informal grievance process, before they can submit their handwritten BP 9.  Swift likewise testified that BP 9s were likewise handwritten by inmates during the relevant time period.  Despite this practice, Mr. al-Kassar's repeated attempts to submit his handwritten BP 8 and BP 9 forms were rejected (or discarded) when presented to the unit staff, particularly, Swift.  Inmate Rendelman likewise testified of FCI – Terre Haute's practice of discarding unwanted BP 8s and 9s in the relevant time period.  Swift's refusal or failure to accept Mr. al-Kassar's these complaints via his handwritten forms and thoroughly processing Mr. al-Kassar's complaints as required by the BOP's administrative remedy program constitutes "unavailability" of a remedy.

15.     "Prison officials may not take unfair advantage of the exhaustion requirement, … and a remedy becomes 'unavailable' if prison employees do not respond to a properly filed grievance or otherwise use affirmative misconduct to prevent a prisoner from exhausting."  *Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006.)  It is found that Defendants attempted to take an unfair advantage of the exhaustion requirement by their undisputed failure to respond to al-Kassar's properly filed grievances when he submitted **Exs. 9-11** to Swift and Dobbins.

16.     Furthermore, based on testimony from Mr. al-Kassar, Schalburg and Rendelman, it is evident inmates often complained to BOP staff about unit staff failing to provide them with the BP 8 and BP 9 forms upon request and BOP staff refusing to accept handwritten BP 8 and BP 9 forms when the same was the policy under Ms. Kimberly.  Schalburg admitted to having knowledge of inmates making complaints about unit staff denying them the BP 8 and BP 9 forms.  Nonetheless, no action was taken to cure the issue for Mr. al-Kassar.  Additionally, FCI – Terre Haute personnel have never been disciplined for failures to provide BP 8 or BP 9 forms, or to

- 23 -

process the same.  Thus, there exists no incentive for FCI – Terre Haute personnel to fully process all inmates BP 8 and BP 9s at FCI – Terre Haute, or to provide them forms when requested, as a refusal to do the same will not subject BOP personnel for discipline.

17.     Moreover, Mr. al-Kassar was further subjected to unavailability of administrative remedies when he arrived at USP-Marion.  Shortly upon his arrival, Mr. al-Kassar attempted to raise his FCI – Terre Haute CMU SHU grievances with Hill at mail call.  Hill incorrectly informed Mr. al-Kassar, or left him with the impression and understanding, that he is in a different state and facility and should have handled the grievances at FCI – Terre Haute while in the CMU SHU at FCI – Terre Haute at FCI – Terre Haute.  This statement was a material misrepresentation by Hill and further constitutes unavailability because it led Mr. al-Kassar to believe that due to his transfer, the administrative remedy process was not available.

18.     When Mr. al-Kassar eventually became aware of the fact that he could raise administrative complaints at USP – Marion, he attempted to do so only to be denied and rebuffed at USP – Marion as well.  The fact that Mr. al-Kassar raised other complaints at USP-Marion prior to February of 2017 which had a nexus to FCI – Terre Haute (for example, the status of belongings not delivered to him in Marion from Terre Haute) provides no remedy for Defendants here.  Mr. al-Kassar apparently reasonably viewed his torture claims as being exclusive to Terre Haute, not ongoing violations that carried over to Marion.  Thus, the instant claims alone appeared covered by Hill's admonition against asserting Terre Haute claims in Marion, rendering administrative remedies for them unavailable to Mr. al-Kassar at USP-Marion.

19.     These conclusions of law shall include any finding of fact which is a conclusion of law.

20.     Therefore, this Court finds that, as a matter of law, it would have been futile for Mr. al-Kassar to pursue his administrative remedies further at USP – Marion because there existed no avenue for him to cure the malfeasance perpetrated against him by the personnel at FCI – Terre Haute, Warden Julian, Swift and Dobbins in particular.

21.     For the foregoing reasons, the Court finds that Defendants have failed to carry their burden to demonstrate that Mr. al-Kassar failed to exhaust his administrative remedies.  The law is with Mr. al-Kassar.  The law is against Defendants.  Mr. al-Kassar's *Bivens* Claims (Claims One, Two and Three) (as discussed in DEs 17 and 23) will proceed with discovery on the merits.

SO ORDERED THIS _____ DAY OF _____, 2020.


_____
Hon. James P. Hanlon
Judge, U.S. District Court, S.D. Ind.


Respectfully submitted,

ICE MILLER, LLP

*/s/ David J. Carr*_____
David J. Carr, Attorney No. 4241-49
Paul C. Sweeney, Attorney No. 20392-29
Joana O. Ampofo, Attorney No. 35896-49
One American Square, Suite 2900
Indianapolis, IN 46282-0200
Ph.: (317) 236-2100
Fax: (317) 236-2219
David.Carr@icemiller.com
Paul.Sweeney@icemiller.com
Joana.Ampofo@icemiller.com

**ATTORNEYS FOR PLAINTIFF**

I\15769725.4

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 4, 2020, a copy of the foregoing PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW FOR PLAINTIFF MONZER AL-KASSAR was filed electronically. Service of this filing will be made on all ECF-registered counsel of record by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

I further certify that on December 4, 2020, a copy of the foregoing was mailed, by first class U.S. Mail, postage prepaid and properly addressed to the following:

Monzer Al-Kassar
Prisoner No. 61111-054
U.S. PENITENTIARY
Inmate Mail/Parcels
P.O. Box 1000
Marion, IL 62959

/s/ *David J. Carr*
David J. Carr

ICE MILLER, LLP
One American Square, Suite 2900
Indianapolis, IN 46282-0200
Ph.: (317) 236-2100
Fax: (317) 236-2219
David.Carr@icemiller.com

I\15769725.4