UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| MONZER AL-KASSAR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:18-cv-00086-JPH-DLP |
| | ) | |
| S. JULIAN Warden, FCC-Terre Haute, | ) | |
| FNU RIGSBY Captain, FCC Terre Haute, | ) | |
| M. SAMPLE, | ) | |
| CLINT SWIFT Case Manager, FCC-Terre Haute, | ) | |
| CMU, | ) | |
| EVELYN KELLER Intelligence Research | ) | |
| Specialist, FCC-Terre Haute CMU, | ) | |
| FNU RODRIGUEZ Lieutenant, FCC-Terre Haute, | ) | |
| ROBERT ROLOFF Chaplain, FCC-Terre Haute, | ) | |
| FNU MCCOY C/O, FCC-Terre Haute, | ) | |
| FNU DUBBINS C/O, FCC-Terre Haute, | ) | |
| CORY MILLER C/O, FCC- Terre Haute, | ) | |
| FNU SULLIVAN C/O, FCC-Terre Haute, | ) | |
| FRANK HART C/O, FCC-Terre Haute, | ) | |
| AMY ADAMS Recreation Supervisor, FCC-Terre Haute, | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendants. | ) | |

**ENTRY SUSTAINING DEFENDANTS' AFFIRMATIVE DEFENSE OF EXHAUSTION AFTER *PAVEY* HEARING**

Monzer Al-Kassar, who was formerly confined at the Federal Correctional Complex in Terre Haute, Indiana (FCC-Terre Haute), brings claims under *Bivens v. Six Unknown Federal Narcotics Agents,* 403 U.S. 388 (1971) and the Federal Tort Claim Act (FTCA). He alleges that 1) the defendants violated his Eighth Amendment rights by knowingly confining him in a filthy windowless hotbox/sweatbox from September 16, 2016, until October 20, 2016; 2) the defendants denied him treatment for high blood pressure and diabetes; and 3) defendant Keller retaliated

1

against him by writing false incident reports, authorizing the use of force, and ordering the denial of medical care because he had sought legal advice from his attorney. Dkt. 45.

As to the *Bivens* claims, the defendants asserted the affirmative defense that Mr. Al-Kassar failed to comply with the exhaustion requirement of the Prison Litigation Reform Act (PLRA). On summary judgment, the Court concluded that Mr. Al-Kassar had exhausted his FTCA claim and allowed that claim to proceed on the merits. Dkt. 94. As to the *Bivens* claims, the Court determined that there was a genuine issue of material fact as to whether the administrative remedy process was available to Mr. Al-Kassar. *Id.*

Because the defendants' motion for summary judgment was denied as to Mr. Al-Kassar's *Bivens* claims, a hearing in accordance with *Pavey v. Conley,* 544 F.3d 739 (7th Cir. 2008) was scheduled. Pro bono counsel was recruited to assist Mr. Al-Kassar in preparation for and participation in the hearing.

Although the Court granted summary judgment in favor of defendant Keller on the retaliation claim, the Court later granted Mr. Al-Kassar's motion to reconsider and reinstated that claim to the extent that the retaliation claim would also be addressed at the *Pavey* hearing.[1] Dkt. 119.

The *Pavey* hearing was conducted on September 3, 2020. Mr. Al-Kassar was present by videoconference. He was ably represented by recruited counsel.[2] Defendants were present and appeared by counsel. Documentary evidence was submitted as well as testimony from twelve witnesses.

---

[1] There was no evidence presented at the *Pavey* hearing that Mr. Al-Kassar attempted to exhaust his administrative remedies as to the claim of retaliation. The three letters addressed to the Warden at issue in this case do not mention retaliation on the part of defendant Keller.

[2] The Court is grateful for the significant time and efforts of volunteer counsel David Carr, Paul Sweeney, and Joana Ampofo of Ice Miller LLP, in representing Mr. Al-Kassar.

For the reasons explained in this Entry, the Court finds that the defendants have met their burden of showing that Mr. Al-Kassar failed to exhaust his available administrative remedies prior to filing this lawsuit with respect to his *Bivens* claims.

## I. Motion *in Limine*

Defendants filed a motion *in limine* asking the Court to preclude Mr. Al-Kassar from offering several categories of evidence at the *Pavey* hearing: (1) testimony from Mr. White who admitted under oath he has no personal knowledge of the relevant facts;[3] (2) various declarations, affidavits, and other out-of-court statements, on the basis of hearsay; and (3) character evidence regarding alleged prior acts of the defendants or other Bureau of Prisons (BOP) witnesses. Dkt. 162.

The *Pavey* hearing was not before a jury, which "would be far less equipped to understand the limitation against the use of propensity evidence." *United States v. Reed*, 744 F.3d 519, 525 (7th Cir. 2014). "Judges often hear improper argument and other forms of inadmissible evidence that they are presumed to disregard when deciding matters of importance." *United States v. Stinefast,* 724 F.3d 925, 931 (7th Cir. 2013). In a bench trial, it is assumed that "the district court was not influenced by evidence improperly brought before it unless there is evidence to the contrary." *United States v. Shukri,* 207 F.3d 412, 419 (7th Cir. 2000). Here, there is no evidence to the contrary. The motion *in limine*, dkt. [162], is, therefore, **denied in part and granted in part**, consistent with the Court's discussion of how it weighed the evidence throughout this Entry.

---

[3] The Court finds that Mr. White's testimony provided no relevant information, other than the fact that he often helped Mr. Al-Kassar and other inmates with their administrative remedies and lawsuits. Tr. 280:14-285:6.

## II.     Standard of Review

The PLRA requires that "[n]o action shall be brought with respect to prison conditions . . . by a prisoner . . . until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). 42 U.S.C. § 1997e(a); *Porter v. Nussle,* 534 U.S. 516, 524–25 (2002). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter,* 534 U.S. at 532.

"To exhaust available remedies, a prisoner must comply strictly with the prison's administrative rules by filing grievances and appeals as the rules dictate." *Reid v. Balota*, 962 F.3d 325, 329 (7th Cir. 2020); *see also Dale v. Lappin,* 376 F.3d 652, 655 (7th Cir. 2004) ("In order to properly exhaust, a prisoner must submit inmate complaints and appeals in the place, and at the time, the prison's administrative rules require.") (internal quotation omitted). Strict compliance includes "tak[ing] all steps prescribed by the prison's grievance system." *Ford v. Johnson,* 362 F.3d 395, 397 (7th Cir. 2004).

It is the defendants' burden to establish that the administrative process was available to Mr. Al-Kassar and that he failed to use it. *Reid,* 962 F.3d at 329; *see also Thomas v. Reese*, 787 F.3d 845, 847 (7th Cir. 2015) ("Because exhaustion is an affirmative defense, the defendants must establish that an administrative remedy was available and that [the plaintiff] failed to pursue it."). "[T]he ordinary meaning of the word 'available' is 'capable of use for the accomplishment of a purpose,' and that which 'is accessible or may be obtained.'" *Ross v. Blake,* 136 S. Ct. 1850, 1858 (2016) (internal quotation omitted). "[A]n inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of." *Id.* at 1859 (internal quotation omitted).

### III. Findings of Fact and Conclusions of Law

The following facts are found by the Court to be true based on the parties' stipulation, dkt. 167, and the testimony and documents presented during the hearing.

Mr. Al-Kassar is and was at all relevant times a federal inmate in the custody of the BOP. Dkt. 167, ¶ 1. From December 12, 2011, until October 19, 2016, Mr. Al-Kassar was incarcerated in the Communications Management Unit (CMU) at the Federal Correctional Institution in Terre Haute, Indiana (FCI–Terre Haute). *Id.*, ¶ 8.

The CMU is a housing unit in which all inmate communications, email, and telephone calls are monitored. Tr. 118:10-17. As part of that communications monitoring, each CMU inmates' written communications, including cop-outs (written requests from inmates to staff), grievance request forms (BP-9, BP-10, and BP-11), and all other incoming and outgoing mail and documents are scanned and saved to the inmate's electronic file. Tr. 99:14-17; 121:2-13; 122:4-22.

FCI-Terre Haute is one of the three correctional facilities that compose FCC-Terre Haute. Dkt. 167, ¶ 9. On September 16, 2016, Mr. Al-Kassar was moved from the general population CMU to the Special Housing Unit (SHU) at FCI–Terre Haute, where he stayed until October 19, 2016. *Id.*, ¶ 18. On October 19, 2016, Mr. Al-Kassar was transferred from FCI-Terre Haute to the CMU at the U.S. Penitentiary in Marion, Illinois (USP – Marion). *Id.*, ¶ 23.

During the time from September 16, 2016, through October 19, 2016, Defendant Stephen Julian was the Warden of FCI-Terre Haute. *Id.*, ¶ 19. Defendant Clint Swift was a Case Manager in the FCC-Terre Haute CMU. *Id.*, ¶ 20. Defendant Jeffrey Dobbins was a correctional officer and Defendant Evelyn Keller was an Intelligence Research Specialist at the FCC–Terre Haute CMU. *Id.*, ¶¶ 21-22. Defendant Sample was a Unit Manager at the FCC–Terre Haute CMU. Tr. 183:9–12. The CMU unit team consisted of Case Manager Swift, Intelligence Research Specialist Keller,

and Unit Manager Sample. Tr. 65:1-8.

### A. The Grievance Policy

The BOP has promulgated a formal administrative remedy system, codified at 28 C.F.R. § 542.10, *et seq.* and BOP Program Statement 1330.18, Administrative Remedy Procedures for Inmates (P.S. 1330.18), through which an inmate may seek formal review of a complaint related to any aspect of his imprisonment. 28 C.F.R. § 542.10; Dkt. 167, ¶ 2; Ex. 31.[4] P.S. 1330.18, ¶ 8(c)(1) states: "The inmate shall obtain the appropriate form from CCC staff or institution staff (ordinarily, the correctional counselor)." Ex. 31 at 5. P.S. 1330.18 goes on to say that BP-9, BP-10, and BP-11 are appropriate forms. *Id.*

To exhaust his remedies pursuant to 28 C.F.R. § 542.13(a), "an inmate shall first present an issue of concern informally to staff, and staff shall attempt to informally resolve the issue before an inmate submits a Request for Administrative Remedy. Each warden shall establish procedures to allow for the informal resolution of inmate complaints." Ex. 31 at 4 (¶ 7a.); dkt. 167, ¶ 3.

The BOP typically utilizes a form called a BP-8 for the informal resolution process. The "informal resolution attempt may be waived in individual cases at the Warden or institution Administrative Remedy Coordinator's discretion when the inmate demonstrates an acceptable reason for bypassing informal resolution." 28 C.F.R. § 542.13(b); Ex. 31 at 4; dkt. 167, ¶ 3.

An inmate who is dissatisfied with the result of his attempt at informal resolution or wishes to bypass informal resolution may begin the formal administrative process by submitting "the appropriate form (BP-9)" to "the institution staff member designated to receive such Requests (ordinarily a correctional counselor)" within 20 calendar days of the incident giving rise to the request. 28 C.F.R. § 542.14(a); Ex. 31 at 4; dkt 167, ¶ 4. BP-9 submissions are recorded in the

---

[4] Any reference to "Ex." refers to an exhibit introduced at the September 3, 2020 *Pavey* hearing.

6

BOP's electronic record system, the SENTRY database, with the notation "F" after the remedy identification number. Tr. 26:14-16.

If the inmate is dissatisfied with the response to his BP-9, he may appeal to the Regional Director by submitting "the appropriate form (BP-10)" to the appropriate Regional Director "within 20 calendar days of the date the Warden signed the response" to the BP-9. 28 C.F.R. § 542.15(a); Ex. 31 at 6–7; dkt. 167, ¶ 5; Tr. 24:22–25:5. BP-10 submissions are recorded in the SENTRY database with an "R" notation following the remedy identification number. Tr. 39:4-8.

If the inmate is dissatisfied with the Regional Director's response to his BP-10, he may appeal to the General Counsel by submitting "the appropriate form (BP-11)" by mail to the BOP Central Office "within 30 calendar days of the date the Regional Director signed the response." 28 C.F.R. § 542.15(a); Ex. 31 at 7; dkt. 167, ¶ 6. The BP-11 is the final level of administrative appeal. 28 C.F.R. § 542.15(a).

When an inmate submits a formal administrative remedy request, facility staff log it into the SENTRY database. Tr. 25:21–27:11. All submitted BP-9, BP-10, and BP-11 forms are entered into the SENTRY system, even if they are rejected, Tr. 27:8-11, and BOP staff can use the SENTRY system to generate a report that shows every administrative remedy request an inmate has ever submitted. Tr. 34:6-13; *see also* Ex. 43 (Plaintiff's SENTRY report). Each entry in the database includes a remedy identification number, the inmate's Federal Register Number, and a short description of the request. Tr. 26:10-27:2. After the remedy is assigned an identification number, BOP staff write that number on the submitted form, typically in the lower right corner. Tr. 27:3-7. Informal attempts at resolution, regardless of whether they are memorialized on a BP-8 form, are not recorded in the SENTRY database. Tr. 36:23–37:4. Similarly, neither cop-outs nor

7

email messages sent by inmates using the TRULINCS email system are recorded in the SENTRY database. Tr. 35:17-36:22.

Pursuant to Institution Supplement Number THX-1330.18A, dated January 22, 2016, "[i]t shall be the practice at FCC Terre Haute to informally resolve inmate complaints whenever possible. Inmates will present their complaints verbally to their unit team, ordinarily the correctional counselor. In the absence of the correctional counselor, inmates will be permitted to present their issue to any staff member assigned to their unit team." Ex. 30 at 2; dkt. 167, ¶ 10.

If a BP-9, BP-10, or BP-11 is submitted after the applicable deadline, it is subject to rejection. 28 C.F.R. § 542.17(a); Tr. 23:6-13. When a submission is rejected as untimely, the inmate receives a written notice of the rejection notifying them of the reason for the rejection and instructions on how to cure the defect. 28 C.F.R. § 542.17(b); Tr. 23:14-17. "Where the inmate demonstrates a valid reason for delay, an extension in filing time may be allowed." 28 C.F.R. § 542.14(b). "In general, valid reason for delay means a situation which prevented the inmate from submitting the request within the established time frame." *Id.* Valid reasons for delay include an extended period of being in-transit, an extended period of time during which the inmate was physically incapable of preparing a request or appeal, an unusually long period taken for informal resolution attempts, and indications by an inmate, verified by staff, that a response to the inmate's request for copies of remedy responses was delayed or the delay in submission was otherwise not the inmate's fault. *Id.*; *see also* Tr. 23:18-24:10 (describing circumstances in which untimely administrative remedy requests would be accepted).

### B. Mr. Al-Kassar's Grievance History

From 2012 through February 20, 2015, Mr. Al-Kassar submitted numerous BP-8s, BP-9s, and BP-10s utilizing the forms provided at FCI–Terre Haute. Dkt. 167, ¶¶ 11-17. These grievances

8

are unrelated to his *Bivens* claims at issue in this case. They demonstrate that he was aware of how to use the BOP's administrative remedy system, and the correct forms. Exs. 34-40, 43; dkt. 167, ¶¶ 11–17; Tr. 37:5– 44:10.

On May 16, 2012, Mr. Al-Kassar submitted a completed BP-9 form with various attachments, including a completed BP-8 form. The matter was resolved, so Mr. Al-Kassar withdrew his BP-9. Dkt. 167, ¶ 11; Tr. 38:6-10; Ex. 34; Ex. 43 at 5.

On April 4, 2013, he submitted a completed BP-9 with an attached BP-8, and ultimately appealed to the proper Regional Office using a BP-10. Dkt. 167, ¶ 12; Tr. 38:23-39:8; Ex. 35; Ex. 43 at 6. That same day, he submitted another completed BP-9 form. Dkt. 167, ¶ 13; Tr. 39:9-25; Ex. 36. When the Warden denied the grievance, Mr. Al-Kassar appealed by timely mailing a completed BP-10 to the appropriate Regional Office, but he did not appeal further. Dkt. 167, ¶ 13; Ex. 43 at 7.

On July 2, 2013, Mr. Al-Kassar submitted another completed BP-9 form with attachments, including a completed BP-8 form. Dkt. 167, ¶ 14; Tr. 40:12-41:1; Ex. 37; Ex. 43 at 8. Mr. Swift initialed the BP-8 form showing the date he gave it to Mr. Al-Kassar, the date Mr. Al-Kassar returned it to him, the date he gave Mr. Al-Kassar a BP-9 form, and the date Mr. Al-Kassar submitted the BP-9 form to him. Ex. 37 at 2.

On November 22, 2013, Mr. Al-Kassar submitted a BP-9 form with attachments, including a completed BP-8 form that again bore Mr. Swift's initials on the dates of issuance and return. Dkt. 167, ¶ 15; Tr. 41:2-15; Ex. 38; Ex. 43 at 9. The Warden denied the grievance. Dkt. 167, ¶ 15; Ex. 38 at 1.

On July 18, 2014, Mr. Al-Kassar submitted a completed BP-9 form with a completed BP-8 form attached. Dkt. 167, ¶ 16; Tr. 41:18-42:7; Ex. 39; Ex. 43 at 9. His complaint was informally

resolved, and he withdrew his BP-9. Ex. 167, ¶ 16; Tr. 41:25-42:7; Ex. 39 at 1.

On October 22, 2014, Mr. Al-Kassar submitted a BP-9 form with various attachments, including handwritten and typewritten pages with the caption "BP-8" at the top. Dkt. 167, ¶ 17; Tr. 42:8-44:4; Ex. 40; Ex. 43 at 10. In his BP-9, he complained that he "made the request for a BP-8 from Case Manager Mr. C. Swift" but he "was not given the proper BP-8 form to properly file and attach hereto." Ex. 40 at 1. The BP-9 was received at the facility level, but the Administrative Remedy Clerk rejected it—not because Mr. Al-Kassar failed to attach a "proper BP-8" form, but because the issue he was complaining about (his extradition request) was "an issue for the courts" rather than the BOP. Ex. 40 at 11; Tr. 43:16-44:4; Ex. 43 at 10. Mr. Al-Kassar appealed to the Regional Office, and when that was unsuccessful, to the Central Office. Dkt. 167, ¶ 17; Ex. 43 at 10.

After he was moved to the SHU on September 16, 2016, Mr. Al-Kassar still had access to mailing and writing supplies. While in the SHU, he purchased a pen, two legal envelopes, two writing pads, and 58 stamps. Tr. 54:22-55:25; Ex. 33. Officer Dobbins also gave Mr. Al-Kassar pens and paper while he was in the SHU. Tr. 107:22-24. In addition, Mr. Al-Kassar had access to a law library upon request. Tr. 73:22–74:7.

### C. Letters to the Warden of FCI-Terre Haute

Mr. Al-Kassar claims to have exhausted the administrative process by writing three letters. Specifically, Mr. Al-Kassar testified that while he was in the SHU, he wrote three letters to Warden Julian in which he complained about the conditions of his confinement. Tr. 192:14-15; 193:7-12; 194:17-19; 195:3-6; 195:20-21; 196:1-2; 196:10. He testified that he considered the first letter, dated September 21, 2016, to be a BP-8 and that he gave it either to Officer Dobbins or to Mr. Swift (he could not recall which) shortly after he wrote it. Tr. 193:9-12, 194:12; Ex. 9.

Mr. Swift, Officer Dobbins, and Warden Julian testified that they never saw the September 21, 2016, letter before this lawsuit was filed. Tr. 88:14-19; 107:25-108:14; 143:13-22; 148:25-149:2. Also, Officer Dobbins testified he did not accept documents from inmates except law library requests and cop-outs. Tr. 105:4-21. Mr. Swift confirmed that correctional officers do not play any role in the administrative remedy process. Tr. 70:16-18. Based on their demeanor and consistent testimony, the Court finds Officer Dobbins' and Mr. Swifts' testimony about the first letter credible.

The second letter, dated September 29, 2016, was attached to an administrative remedy request that Mr. Al-Kassar submitted in February 2017, several months after he had been transferred to USP–Marion. Ex. 4 at 4; Ex. 10. Mr. Al-Kassar testified that he considered this letter to be a BP-9 and that he gave it to Warden Julian shortly after he wrote it and then gave a copy of it to Officer Dobbins. Tr. 194:16-195:19. The letter indicates that Mr. Al-Kassar gave it to Officer Dobbins at 3:19 p.m. on September 29, 2016. Ex. 10.

Officer Dobbins testified that he had no role in the administrative remedy process and that if an inmate tried to give him an administrative remedy form, he "would not take it." Tr. 104:15-20; 105:8-10. In addition, Officer Dobbins' shift ended at 3 p.m. Tr. 104:2-6, 115:19-23. Finally, neither he nor the Warden had seen the letter before this action was filed. Tr. 113:8-23; 149:8-14. Based on his demeanor and consistent testimony, the Court finds Officer Dobbins' testimony credible.

The third letter, dated October 10, 2016, was most likely found in Mr. Al-Kassar's property after he was transferred to USP–Marion on October 19, 2016. Tr.126:8-25; 127:1-17; Ex. 11; Ex. 42. Pursuant to FCI–Terre Haute CMU policy, it was scanned into his electronic file on October 21, 2016. Ex 42 at 3; Tr. 82:9-19; 127:5–17. Although Mr. Al-Kassar testified he gave the letter to a BOP employee, Tr. 232:11-233:3, he did not identify who. It could not have been Mr. Swift

11

because he was on vacation that day. Tr. 65:25-66:12; 81:8-12. The Court finds credible the testimony of Warden Julian and Mr. Swift that they had not seen the letter before the lawsuit was filed. Tr. 94:7-21; 150:6-14.

Administrative remedy forms are scanned into the inmate's electronic file the day they are submitted. Tr. 127:5-7. Neither of the first two letters were scanned into Mr. Al-Kassar's electronic file. The Court does not find persuasive Mr. Al-Kassar's theory that Mr. Swift received the letters and threw them away.[5]

None of the handwritten letters initiated the administrative remedy process because they were not received by the proper authorities. On this point, the Court finds Mr. Al-Kassar's account not credible. In Mr. Al-Kassar's complaint and amended complaint, he stated in a sworn declaration that he gave all three letters to Mr. Swift. Ex 6 at 7; dkt. 1 at 7; dkt. 45 at 7. He also stated that the Warden told him on October 18, 2016, that he had received all three letters on the days they were tendered. *Id.* These sworn statements conflict with Mr. Al-Kassar's testimony at the hearing to the extent he testified that he gave the second letter to the Warden and a copy to Officer Dobbins the day he wrote it. Tr. 194:16-195:19. This weakens Mr. Al-Kassar's credibility as to what he did with the letters.

It is undisputed that Mr. Al-Kassar did not otherwise timely file a BP-8 or BP-9 asserting the allegations he brings in this case before he filed his lawsuit. He testified that he requested BP-8 and BP-9 forms from Mr. Swift in September and October 2016, but Mr. Swift refused to give them to him. Tr. 193:1-6; 195:10-15; 198:20-24. The Court finds Mr. Al-Kassar's testimony on this point not credible. In at least one instance Mr. Al-Kassar submitted a BP-9 form complaining

---

[5] Inmate Scott Rendelman testified that he sometimes received responses to his BP-8s but when he didn't, he would "assume that they were thrown away." Tr. 274:5-11. Mr. Rendelman's personal assumption is not credible evidence.

12

that he "made the request for a BP-8 from [Mr. Swift]" but he "was not given the proper BP-8 form." Ex. 40 at 1.

Further, Mr. Swift testified that if inmates requested administrative remedy forms, which include the BP-9, BP-10, and BP-11, he would provide them to them. Tr. 66:19-21. If an inmate in the CMU requested an informal resolution, Mr. Swift would fill out the part of the form that had the inmate's name, identification number, the date, a brief summary of their grievance, and what relief they wanted. Tr. 66:21-25. Once a BP-8 was completed, it would be scanned into the electronic files and emailed to the appropriate department head. Tr. 67:1-4; 70:1-6. All an inmate in the CMU had to do was ask him or another member of the case management team for a form and they would give the form to the inmate. Tr. 67:15-22. Mr. Swift did not recall Mr. Al-Kassar ever giving him any handwritten letters in September or October 2016. Tr. 81:4-7.

Mr. Swift recalls Mr. Al-Kassar asking him for BP-9 forms in September and October 2016, and he gave them to him. Tr. 80:20-25. He testified that Mr. Al-Kassar did not give him a completed BP-9 during that time. Tr. 81:1-3.

The Court finds Mr. Swift credible based on his demeanor, consistent testimony, and his answers to counsels' questions, including that he did not always understand what counsel was asking. The Court finds that Mr. Swift was forthright, sincere and honest. The distribution and collection of the administrative remedy forms is part of his daily routine and the Court finds no basis on which to discredit his testimony, especially in light of the fact that the record reflects several previous instances of administrative remedy forms being provided to Mr. Al-Kassar. *See* Exs. 37, 38, 40. Mr. Al-Kassar wrote that Mr. Swift had refused to give him a BP-8 on the first page of Exhibit 40, but that administrative remedy was processed, even with the allegation against Mr. Swift notably in the first sentence. Tr. 79:2-9. The Court finds that if the letters to the Warden

13

had been given to Mr. Swift, they would have been scanned into Mr. Al-Kassar's electronic file because of his closely monitored communications. Tr: 99:11-17; 122:4-22.

### D. USP Marion

When Mr. Al-Kassar arrived at USP Marion on October 19, 2016, Kathy Hill, Intelligence Research Specialist, handled his initial intake. Tr. 158:2-6. During the intake process, Mr. Al-Kassar began telling Ms. Hill about his time at FCI-Terre Haute and his complaints there. Ms. Hill testified that she "cut him off pretty short and said, you know, you are not at Terre Haute anymore, you are at Marion, let's start fresh here." Tr. 159:8-14.

Contrary to Mr. Al-Kassar's testimony, Ms. Hill testified that she did not tell him during mail call a few days after his arrival that he could not submit an administrative remedy form regarding an incident that occurred at his previous facility. Tr. 162:1-11. She testified that she would have told anyone who asked about that to talk to Mr. Burgess, the Case Manager, who knew more about the administrative remedy process. *Id.*[6] She further testified that she has provided administrative remedy forms to Mr. Al-Kassar at his request many times and never refused to give him a form or to collect a completed form. Tr. 161:12-13; 164:24–165:9. Based on her demeanor and consistent testimony, the Court finds Ms. Hill credible.

Mr. Al-Kassar testified that he did not know he could pursue an administrative remedy about an FCI-Terre Haute incident until January 2017, but this is contradicted by the fact that he

---

[6] The Court has considered inmate Falice's testimony that he overheard Ms. Hill tell Mr. Al-Kassar that he could not exhaust his administrative remedies for something that happened at FCI-Terre Haute. Tr. 254:1-12. No weight has been given to this testimony because not only did Mr. Falice not hear the entire conversation between Mr. Al-Kassar and Ms. Hill but Mr. Falice admitted to having a "negative opinion" of Ms. Hill based on her putting him in the SHU and other issues he has had with her. Tr. 256:14-258:3. Similarly, inmate Al-Smadi's testimony that he overheard Ms. Hill deny Mr. Al-Kassar a BP-8 at mail call is given no weight because Ms. Hill had disciplined Mr. Al-Smadi for writing a sexually explicit letter to her. Tr. 270:14-25; 164:4-5.

submitted an administrative remedy about his legal mail at FCI-Terre Haute on November 28, 2016. Ex. 3; Tr. 219:12-19; 223:23-224:2. Moreover, he did not file a BP-9 (with an attached BP-8) about the conditions at FCI-Terre Haute until February 23, 2017. Exs. 4, 5. That grievance was denied as untimely, but the denial form instructed Mr. Al-Kassar to "have staff provide a memo stating the late filing was not your fault, then re-submit" the BP-9. Ex. 5 at 6. Mr. Al-Kassar failed to follow these directions. When asked why he did not follow the directions, he said because he thought he could not do it at USP-Marion, but by that time, he did know he could pursue such grievances because he had done so on November 28, 2016 regarding his legal mail. Tr. 228:13-23; Ex. 3. He also testified that he did not file grievances during the first month or two at USP–Marion, in part, because he was concerned about his health. Tr. 224:5-6. He did not testify that he was incapable of submitting grievances, just that his focus was elsewhere.

This circuit takes "a strict compliance approach to exhaustion." *Lockett v. Bonson*, 937 F.3d 1016, 1025 (7th Cir. 2019) (internal quotation omitted). "An inmate must comply with the administrative grievance process that the State establishes, at least as long as it is actually available to the inmate." *Wilborn v. Ealey,* 881 F.3d 998, 1004 (7th Cir. 2018). Here, Mr. Al-Kassar was aware of the administrative process. He had used it before the incidents alleged in this case occurred. The Court finds credible the evidence showing that the defendants did not prevent him from accessing the grievance process at either prison. The process was available to Mr. Al-Kassar, but he failed to use it.

### IV. Conclusion

The defendants' affirmative defense of failure to exhaust available administrative remedies relating to Mr. Al-Kassar's *Bivens* claims is **sustained.** The *Bivens* claims are **dismissed without prejudice.** *See Ford,* 362 F.3d at 401 (holding that "*all* dismissals under § 1997e(a) should be

without prejudice.").

This leaves for resolution the Federal Tort Claim Act claim. The parties shall have **through April 9, 2021,** in which to report whether it would be beneficial to set the matter for a settlement conference with the Magistrate Judge.

If a settlement conference is not requested, the parties shall have **through April 30, 2021,** in which to either file a dispositive motion on the Federal Tort Claim Act claim or report that genuine issues of material facts preclude such a filing. If a motion for summary judgment is filed, briefing shall proceed in accordance with Local Rule 56-1.

**SO ORDERED.**

Date: 3/31/2021

                                              *James Patrick Hanlon*
                                              James Patrick Hanlon
                                              United States District Judge
                                              Southern District of Indiana

Distribution:

MONZER AL-KASSAR
61111-054
MARION
U.S. PENITENTIARY
P.O. BOX 1000
MARION, IL 62959

Joana O. Ampofo
ICE MILLER LLP (Indianapolis)
joanaampofo@gmail.com

David J. Carr
ICE MILLER LLP (Indianapolis)
david.carr@icemiller.com

Lara K. Langeneckert
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
lara.langeneckert@usdoj.gov

Justin R. Olson
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
justin.olson2@usdoj.gov

Paul Conrad Sweeney
ICE MILLER LLP (Indianapolis)
paul.sweeney@icemiller.com