UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

MONZER AL-KASSAR,                  )
                                   )
                Plaintiff,         )
                                   )
        v.                         )        No. 2:18-cv-00086-JPH-MKK
                                   )
UNITED STATES OF AMERICA,          )
                                   )
                Defendant.         )

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Monzer al-Kassar, who is incarcerated by the Federal Bureau of Prisons (BOP), brings claims against the United States for negligence under the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.* (FTCA), and for infliction of emotional distress under state law. He alleges that he was subject to conditions tantamount to torture, including unbearable heat and noise, complete lack of medical care, and unsanitary conditions, while housed in the Special Housing Unit (SHU) of the Communications Management Unit (CMU) at the Federal Correctional Institution in Terre Haute, Indiana (FCI Terre Haute).[1] Mr. al-Kassar claims that as a result of the conditions he was subjected to in the SHU for approximately one month, he suffered injuries and damages, including back pain, impaired balance, injury to his hand, fear of death, severe symptoms of high glucose and high blood pressure, heat stroke, dehydration, extreme weakness, sleep

_____

[1] Mr. al-Kassar also raised other claims, including under the theory recognized in *Bivens v. Six Unknown Named Agents of Fed. Bur. of Narcotics*, 403 U.S. 388 (1971), but those claims have since been dismissed. Dkt. 44; dkt. 193.

deprivation, impaired sight, impaired hearing, impairment of mental faculties, and emotional trauma. The Court recruited counsel for Mr. al-Kassar and conducted a bench trial on March 6 and 7, 2023, to resolve these claims.[2]  The parties submitted proposed findings of fact and conclusions of law.  Dkt. 291; dkt. 292.   Having considered those filings, the evidence, and arguments presented at trial, the Court now makes findings of fact and conclusions of law in accordance with Fed. R. Civ. P. 52(a)(1).

## I. Findings of Fact

At the outset, a word about the credibility of Mr. al-Kassar's trial testimony is necessary. The vast majority of Mr. al-Kassar's factual allegations are supported solely by his own testimony, with little to no corroborating evidence. Therefore, the Court's evaluation of the veracity of Mr. al-Kassar's trial testimony is critical to his ability to prove-up his claims. As referenced and alluded to elsewhere in these findings, Mr. al-Kassar's trial testimony was often inconsistent, both in relation to answers given at trial and his prior testimony and statements.[3] Also, when subjected to cross-examination, Mr. al-Kassar was often combative, argumentative, and evasive.

For example, Mr. al-Kassar testified that he complained daily to BOP staff about insects and rats in his cell. Tr. Vol. 1 at 112:6-7 ("I complained every minute I can when somebody pass by. They don't give a damn who was inside

---

[2] The Court is grateful for the significant time and efforts of volunteer counsel David Carr, Paul Sweeney, and Kayla Ernst of Ice Miller LLP, in representing Mr. al-Kassar.
[3] The Court notes that it also made adverse credibility findings with respect to aspects of Mr. al-Kassar's testimony at the *Pavey* hearing.  Dkt. 193 at 12

there."). Then, when confronted with his inconsistent deposition testimony, Mr. al-Kassar was evasive:

> Question: And I will re-ask the question I asked before I talked about this deposition. Did you complain to anybody about the insects?
>
> Answer: In my writing, I think. You know, I cannot remember, to be honest, You know, I have complained about everything. You know, my main complaint was not about the insects, about the heat and sound.

*Id.* at 114:9-15.   Mr. al-Kassar then conceded that when asked during his deposition whether he had complained about the insects, he had answered, "I cannot recall", *id.* at 114, in contrast to his trial testimony that he "complained every minute [about the insects] when someone pass by", *id.* at 112:6-7.

Regarding his cell, Mr. al-Kassar testified at trial that it did not have an exhaust fan, Tr. Vol. 1 at 106:21-23 ("No machine in the window."). But he had previously stated in a grievance that "an industrial size exhaust fan was purposefully left running in the cell window while another fan was placed in the cell door." Ex. 4 at 1. And other evidence introduced at trial, *e.g.*, Tr. Vol. 1 at 238:16-25, establishes that the cell, in fact, had an exhaust fan.  Mr. al-Kassar's inconsistent testimony on this point, which was critical to his claim regarding the conditions in his cell, was irreconcilable and not credible.

In another example, Mr. al-Kassar testified that he was never given his self-carry medications. *Id.* at 120:2-4 ("Question: Is it possible that someone brought you those medications later on? Answer: No one brought me any medications."). Yet during his deposition, Mr. al-Kassar answered the same question, "I cannot recall".  *Id.* at 120:11-14. And giving a third variation of the

story, he also testified he had told his daughter during a phone call that he had

been given his self-carry medications after a week in the SHU. *Id.* at 122:7-13.

Next, Mr. al-Kassar was evasive when asked when his alleged back pain

became severe and when he first complained about it to BOP staff:

> Question: So you would agree your back pain did not become severe until
> April of 2018, correct?
>
> Answer: I had – suffered a lot, but sometimes – I'm the sort of person I
> don't complain a lot. My suffer – if you read the report, I did not ever ask
> for a doctor maybe once or twice. I asked to go to sick call. I don't get really
> – I have my medication, I know something – what is good for me, painkiller
> and all of that, but when you start really excessive – to the point where I
> lost my balance . . .
>
> Question: I think you have answered my question. So you didn't complain
> to your doctors about your severe pain until April 2018, is that your
> testimony?
>
> Answer: What I'm trying to say, I did not ask to go to see Ms. Brooks –

*Id.* at 134:25-135:17.

In response to repeated nonresponsive and evasive answers, the Court

made a contemporaneous record of Mr. al-Kassar's conduct, admonishing him:

> Mr. al-Kassar, wait, wait, okay, stop.  Sir, I'm going to tell you again to
> answer his question. The question was: "So you didn't complain to your
> doctors about your severe pain until April 2018, is that your testimony?"
> And if you keep giving additional non-responsive answers and asking him
> questions, then we're going to get into territory where you may not be able
> to give your follow-up answers to your lawyers as a sanction for not
> following the rules and I'm the one who is going to rule on this case and
> so I suggest that you pay attention to the rules, answer his questions, and
> your lawyers will be able to give you a chance to do more talking, but now
> is not the time.

*Id.* at 135:18-136:4.

Based on the foregoing, as well as other instances of inconsistent

testimony identified throughout these findings, and the Court's observations of

Mr. al-Kassar's demeanor when he testified, the Court does not find Mr. al-Kassar's trial testimony credible, and therefore gives it little weight in evaluating his claims.

### A. Mr. al-Kassar

Before being transferred to the SHU, Mr. al-Kassar was confined in the CMU at FCI Terre Haute from 2011 until September 16, 2016. Tr. Vol. 1 at 27:12; Ex. 44 (1st) at ¶ 23.

Mr. al-Kassar suffers from various medical conditions, Tr. Vol. 1 at 43:12-14, and was prescribed numerous medications to treat those conditions, including high blood pressure, diabetic neuropathy, high cholesterol, and diabetes. Tr. Vol. 2 at 357:6-361:17; Ex. 114 at 69.

Mr. al-Kassar testified that before he was transferred to the CMU SHU, he was in good physical health. He stated that he ran for an hour a day, walked for more than an hour, and played basketball, volleyball, and tennis. He did not require assistance to walk or use a cane. Tr. Vol. 1 at 27:17-19. At a medical appointment in June 2016, Mr. al-Kassar's blood pressure was normal, and he weighed 204 pounds. Tr. Vol. 2 at 327:7-329:10; Ex. 110.

### B. Placement in the SHU

Mr. al-Kassar was placed in the CMU SHU on September 16, 2016, and stayed there for about a month, until his transfer to the United States Penitentiary in Marion, Illinois (USP Marion). Ex. 44 (1st) at ¶ 18.

Inmates can be moved to the CMU SHU for several reasons: when they are pending transfer to another facility, as punishment for disciplinary incident

reports, when they are under investigation, or if they request protective custody. Tr. Vol. 1 at 229:23-25, 233:3-234:4. BOP moved Mr. al-Kassar to the CMU SHU pending transfer to USP Marion to separate him from Shaun Bridges, another CMU inmate.[4] *Id.* at 230:3-4, 231:10-14. Mr. Bridges was manipulating Mr. al-Kassar by telling him lies intended to make him believe that Mr. Bridges could help him get released. *Id.* at 234:6-16.

The CMU SHU is a unit of between six and eight cells separated from the rest of the CMU. *Id.* at 205:4-18, 217:21-25, 237:24-238:6. This unit also has a shower, law library, and a linen closet. *Id.* at 205:15-18, 217:25-218:3, 238:5-6. Each cell in the CMU SHU had an exterior window through which inmates could observe daylight. *Id.* at 40:13, 218:4-9, 238:22-23. Mr. al-Kassar's cell was about 4 meters by 3 meters in size. *Id.* at 39:21-23. It had a metal door with an approximately 6-inch by 6-inch metal mesh screen, a concrete floor, a bunk bed with a mattress, a toilet, and a sink with running water. Mr. al-Kassar testified that the water from the sink was brown and that he did drink it. *Id.* at 39:24-40:2, 41:4-12, 49:19-22; 107:24-25.

BOP employee Clint Swift worked as a Case Manager in the CMU while Mr. al-Kassar was in the CMU SHU.  *Id.* at 203:20-21.  He testified that BOP staff checked on inmates in the CMU SHU every 30 minutes, and that medical personnel checked on inmates in the CMU SHU at least twice daily.  *Id.* at

---

[4] Mr. al-Kassar disputes the reason that he was placed in the SHU but has provided no evidence contradicting the reason given by the BOP, which is supported by evidence.  Regardless, the reason why Mr. al-Kassar was put in the SHU is not material to the Court's evaluation of his claims.

206:11-16. When at work, Mr. Swift personally interacted with Mr. al-Kassar daily, and never observed Mr. al-Kassar in any type of distress. *Id.* at 209:3-12.

BOP employee Jeff Dobbins was the Senior Officer Specialist assigned with overseeing the CMU while Mr. al-Kassar was in the CMU SHU.  *Id.* at 238:1-3. On the days he worked, Mr. Dobbins walked the CMU SHU every 30 minutes, interacting with Mr. al-Kassar multiple times daily. *Id.* at 238:12-13, 240:24-241:1. Mr. al-Kassar never complained to him about the temperature, a hot floor, noise or other conditions, nor did he request medical care. *Id.* at 241:6-242:4. He never observed Mr. al-Kassar in any type of distress. *Id.* at 242:20-22.

### C. Heat

The FCI Terre Haute was built in 1940. Ex. 118 at 7. It was not equipped with air-conditioning at the time of construction, and most of the building, including the CMU SHU, is not air conditioned. Tr. Vol. 1 at 206:21-25. Instead, the temperature during the non-winter months in the CMU SHU is regulated by a ventilation system through which air is blown from an industrial, pedestal fan sitting outside the CMU SHU cells into the individual cells through the grated window in the cell doors. *Id.* at 106:9-10, 207:3-6, 219:11-17, 238:16-25, 266:1-9. Warm air is also pumped out of the cells through each cell's exhaust fan, which is mounted within each cell's window.[5] *Id.* at 207:3-6, 219:18-23, 238:16-25.

---

[5] While Mr. al-Kassar denied at trial that his cell in the SHU had an exhaust fan, Tr. Vol. 1 at 106:21-23 ("No machine in the window."), he stated in a grievance that "an industrial size exhaust fan was purposefully left running in the cell window while another fan was placed in the cell door." Ex. 4 at 1. Moreover, the other evidence introduced at trial, *e.g.*, Tr. Vol. 1 at 238:16-25, establishes that the cell had an exhaust

BOP regulations require FCI Terre Haute to ensure that "at least 10 cubic feet of outside or recirculated filtered air per minute per person is provided in inmate cells..." Ex. 116 at 38 (BOP Program Statement P1600.09). To confirm compliance with this requirement, FCI Terre Haute must undergo an independent ventilation assessment at least once per American Correctional Association (ACA) accreditation cycle. *Id.* FCI Terre Haute had a ventilation, lighting, and sound level survey between April 26 and April 28, 2016. Ex. 119 at 1; Tr. Vol 1 at 160:10-11. As part of the survey, ventilation flow rates were randomly gathered in different parts of the facility, including the housing units. Ex. 119 at 2. The survey concluded that the ventilation flow rates met ACA requirements. *Id.* at 1; Tr. Vol. 1 at 160:14-15. In addition, BOP witnesses testified that the unit was not excessively hot. *See* Tr. Vol. 1 at 156:19-21, 178:13-22, 207:15-17, 220:12-20, 239:7-9, 257:22-23.

The Court concludes that while Mr. al-Kassar's cell in the SHU may have been uncomfortably warm, the temperature was not as extreme as described by Mr. al-Kassar. Mr. al-Kassar's testimony about the temperature was often inconsistent with his prior earlier statements, and otherwise incredible. For example, as explained above, Mr. al-Kassar's trial testimony that his cell did not have an exhaust fan is not credible.   In addition, Mr. al-Kassar testified that his cell was so hot that he could not step on the floor with bare feet. Tr. Vol. 1 at 41:3-7. Given the lack of sunlight, the Court finds this claim incredible on its

---

fan. Mr. al-Kassar's inconsistent testimony on this point is irreconcilable so the Court gives no weight to Mr. al-Kassar's testimony that his cell had no exhaust fan.

face.  It is also contradicted by the testimony of Officer Dobbins who observed Mr. al-Kassar walk on his cell floor without shoes every day to retrieve his food tray. *Id.* at 241:10-12. And even if the floor was uncomfortably warm, Mr. al-Kassar had access to slippers the entire time he was in the CMU SHU that he could have used to protect his feet from the floor. *Id.* at 108:17-109:1. Finally, Dr. Randall Pass, who examined Mr. al-Kassar after his transfer to the USP Marion, testified that the feeling of heat in his feet that Mr. al-Kassar described while in the CMU SHU is likely attributable to neuropathy that causes Mr. al-Kassar to experience a burning sensation in his feet. Ex. 110 at 1; Tr. Vol. 1 at 306:14-308:5.

Mr. al-Kassar also points to the testimony of Shaun Bridges and Paul Bergrin, which was submitted in the form of Mr. Bridges' deposition and Mr. Bergrin's interrogatory responses, regarding the conditions in the CMU SHU. But like the testimony of Mr. al-Kassar on this point, the Court does not find the testimony of Mr. Bridges or Mr. Bergrin credible.

Mr. Bridges was not in the CMU SHU at the same time as Mr. al-Kassar. Ex. 79 at 47:3-5, 62:6-14. Moreover, Mr. Bridges' testimony is questionable at best, given that his relationship with Mr. al-Kassar was premised on lying to him to obtain information. *Id.* at 52:13-23; 60 (also stating that he didn't recall what he told Mr. al-Kassr "because whatever [he] told him was 99 percent untrue", and that he fabricated documents as part of a ruse to try to get information from Mr. al-Kassar).

Mr. Bergrin's interrogatory answers are hyperbolic and inconsistent. *See, e.g.*, Ex. 77 at 9 (stating in response to Interrogatory No. 7 that the heat in the cell "was analogous to walking into a furnace or when the oven door opens after cooking a Thanksgiving Turkey for 8 hours; and it never stopped. It was like this 24 hours a day, every day."); *compare* Ex. 77 at 11 ("Interrogatory No. 9: … [t]here was a huge (one of them) fan outside the cells + in the common area … the fan … blew dust, dirt, dead insects, mosquitos etc. into our cells + hot air") *with* Ex. 78 at 2 ("Interrogatory No. 1: … [t]he cells were blocked from underneath with a rubberized, rolled suppressor, thereby permitting no air, sound, nor materials to be passed via the cell door").

In contrast to the testimony of Mr. al-Kassar, Mr. Bergrin, and Mr. Bridges, BOP witnesses credibly testified that the unit was not excessively hot. *See* Tr. Vol. 1 at 156:19-21, 178:13-22, 207:15-17, 220:12-20, 239:7-9, 257:22-23. The testimony of the BOP witnesses is corroborated by the ventilation survey that concluded the ventilation systems at the facility complied with the BOP's requirements. While Mr. al-Kassar contends that the survey does not indicate that the CMU SHU specifically was evaluated, he has presented no reason to conclude that the ventilation system there was different from the systems in other parts of the facility or that any changes in ventilation occurred in the few months between when the survey was conducted and Mr. al-Kassar was moved to the CMU SHU. The Court thus credits the BOP witnesses' testimony and the ventilation survey in concluding that the CMU SHU was not as hot as described by Mr. al-Kassar.

**D. Noise Levels**

Mr. al-Kassar testified that the fans in the SHU were excessively loud, preventing one from hearing another speak.

He contends that when Warden Julian came to his cell, he had to have the fan turned off just so he could talk to Mr. al-Kassar. *Id.* at 41:22-25. But BOP witnesses testified that they could converse inside the CMU SHU and speak over the fans without difficulty. *Id.* at 207:7-11, 220:7-11, 239:1-4, 257:24-258:2. And no BOP witness was aware of the screeching mechanical noise described by Mr. al-Kassar. *Id.* at 207:21-23, 220:21-23, 239:13-15.

The Court credits the BOP witnesses' testimony about the noise level in the SHU over Mr. al-Kassar's testimony. First, Mr. al-Kassar had a phone call with his daughter from his cell. Ex. 104; Ex. 105. While Mr. al-Kassar says that he was able to conduct the call only by holding the phone close to his ear, he had "no problem hearing [his] daughter speak to him when [he] was talking to her on the phone". Tr. Vol. 1 at 110:24-111:21. Next, the FCI Terre Haute must undergo regular noise level surveys "to ensure that housing areas do not have excessive noise sources (e.g., noisy pipes, fans, ice machines, or mechanical rooms) close to inmate sleeping areas." Ex. 116 at 27. The April 2016 survey took random sound level measurements in all housing and segregation units and concluded that all sound level measurements were below the limits established in ACA standards. Ex. 119 at 1-2, 4; Tr. Vol. 1 at 160:10-17. In addition, the June 2016 ACA accreditation audit found that "[t]hroughout the tour … noise

11

levels … were within normal standards ranges. This includes the FCI[.]" Ex. 118 at 7; Tr. Vol. 1 at 163:21-22.

As with the ventilation survey, Mr. al-Kassar challenges the applicability of the noise level surveys to his allegations that the fans in the CMU SHU specifically were unbearably loud. He points out that those audits and surveys pre-date his time at the SHU and lack specific references to a visit of the SHU cells. *See* Exs. 118, 119. He also contends that Warden Julian cannot recall whether surveyors visited the CMU SHU cells specifically. Tr. Vol. 1 at 186:8-18. But, again, there's no credible evidence casting doubt on the accuracy of the survey. Moreover, while multiple witnesses testified that the fans in the SHU were not overly loud, no witness corroborated Mr. al-Kassar's account of the "screeching" sound.

### E. Sanitation

Mr. al-Kassar testified that his cell was unsanitary with urine dripping from the ceiling and an infestation of insects and rats. *Id.* at 40:5-9. But the June 2016 accreditation audit found that "[e]nvironmental conditions throughout the FCC in both housing and institutional areas are of high quality" and that FCI Terre Haute's sanitation was "outstanding." Ex. 118 at 7-8; Tr. Vol. 1 at 163:23-25. The ACA audit team stated it "was very impressed with the degree of cleanliness found throughout the facilities during our tours . . . . Cleaning chemicals and cleaning equipment is maintained and issued as needed." Ex. 118 at 8. In addition, CMU SHU cells, like Mr. al-Kassar's, are cleaned by the inmates. Tr. Vol. 1 at 207:24-208:2, 239:16-18.

Furthermore, the evidence shows that FCI Terre Haute must maintain a plan for pest control, ex. 116 at 28, and that FCI Terre Haute staff were required to "come in and treat for pests and whatever the inmates were complaining about." Tr. Vol. 1 at 157:25-158:3. Pests were treated routinely by safety department staff responding to complaints and spraying the infested area. *Id.* at 158:4-10, 221:6-12. No BOP witness observed pests in Mr. al-Kassar's cell. *Id.* at 156:19-21, 208:3-5, 220:24-221:1, 240:2-4, 241:17-18.

The Court credits the testimony of BOP personnel over Mr. al-Kassar's testimony. When the BOP personnel testimony is viewed along with evidence of the FCI sanitation and pest control plan, there's no credible evidence that Mr. al-Kassar was subjected to the unsanitary conditions that he described.

### F. Time Outside the Cell

During his time in the CMU SHU, Mr. al-Kasar left his cell to go to recreation two or three times. *Id.* at 44:5-8, 46:19, 103:15-104:18. He also left his cell to use the computer. *Id.* at 46:24-47:2. Mr. al-Kassar admits that he was able to shower during his stay in the SHU. *Id.* at 74:16-23, 140:23-24. While he initially stated that he was only given the opportunity to shower two or three times total, he later admitted that he was given more opportunities to shower but declined. *Id.* at 140:21-24.

Mr. al-Kasser testified that his time outside his cell provided minimal relief from the conditions inside. *Id.* at 46:14-47:11.

13

**G. Medical Care**

Mr. al-Kassar testified that he was denied his medications and other necessary medical care while he was in the SHU.

The trial testimony establishes that medical staff visited inmates in the SHU daily. *Id.* at 200:20-22, 206:14-16, 218:21-25. Indeed, BOP staff gave Mr. al-Kassar a glucose meter the day after he was moved to the CMU SHU, which he used in his cell. *Id.* at 42:17-43:9; Ex. 28 at 1. Mr. al-Kassar contends that, when he tested his glucose, it registered over 300, but he provided no testimony about how many times his glucose tested at this level. Tr. Vol. 1 at 43:4-8.

Medications in the BOP can be self-carry, which means multiple doses of the medication are dispensed to the patient and the patient is responsible for taking the medication in his cell, or distributed through pill pass, which means a medical provider must dispense each dose to the patient directly. *See* Tr. Vol. 2 at 317:23-318:3, 362:6-10, 363:5-8. Before his transfer to the CMU SHU, Mr. al-Kassar self-carried most of his medications. Tr. Vol. 1 at 43:12-14. But his neuropathy medication (amitriptyline) was delivered to him every evening. Tr. Vol. 2 at 317:13-318:3, 361:20-362:10; Ex. 111. It was not a self-carry medication because it presented an overdose risk. Tr. Vol. 2 at 318:4-11. When he was transferred to the SHU, staff did not allow Mr. al-Kassar to take his self-carry medications with him. Tr. Vol. 1, at 43:12-19. Mr. al-Kassar testified that, despite his pleas, staff never brought him his medication. *Id.* at 43:19-25.

The Court does not credit Mr. al-Kassar's testimony that he never received his medications while he was in the CMU SHU. First, the evidence shows that

BOP personnel visited Mr. al-Kassar and distributed medication to him daily. While he testified at trial that he was given one pill only a few times at night to help him sleep, BOP medical administration records show that he was regularly given his amitriptyline while in the SHU. Ex. 111.[6] The BOP medical administration record is further corroborated by Mr. al-Kassar's deposition testimony that he regularly received medication from BOP personnel while in the SHU. Ex. 125 at 46:14-23. ("Q. And then once you got to the SHU, did you receive your medications again? A. At nighttime, somebody used to come and give me one pill, small pill. Q. Okay. Did that person come every night? A. Yes. I don't know if every night, but -- you know, they don't come every night...."). Mr. al-Kassar also told his daughter during a phone call that BOP brought him his self-carry medications, albeit a week after he arrived in the SHU. Tr. Vol. 1 at 123:3-9.[7]

Next, Mr. al-Kassar underwent an initial medical screening when he arrived at USP Marion on October 19, 2016. Ex. 112; Tr. Vol. 1 at 329:14-330:3. While Mr. al-Kassar's weight was not noted at this screening, it showed that he had no recent weight loss, no current mental health complaints, and a complaint of low back pain. Ex. 112 at 1-2.

---

[6] This record also shows that Mr. al-Kassar received medication on a few dates after he had left the FCI-Terre Haute. While this is clearly an error, it does not show that Mr. al-Kassar never got his medication.

[7] Mr. al-Kassar explained at trial that he told his daughter this because he did not want her to worry about him. *Id.* The Court finds this testimony not credible because Mr. al-Kassar complained during that phone call about being unable to sleep and stated that he was being tortured. Ex. 60. Mr. al-Kassar's testimony is at best inconsistent on this point.

He later underwent a full medical examination on October 25, 2016, which showed that his blood pressure and diabetes were under control. Ex. 113; Tr. Vol. 2 at 310:18-311:1. Dr. Randall Pass, who performed this exam, testified that Mr. al-Kassar's condition was inconsistent with a patient who had not taken his medications for the past month. Tr. Vol. 2 at 311:6-15, 316:1-7. And Mr. al-Kassar did not mention to Dr. Pass that he had not taken all his medications recently. *Id.* at 311:12-15, 316:5-7. Mr. al-Kassar said that he was no longer taking one of the medicines for his mental health, from which Dr. Pass inferred "if there were any other medicines he wasn't taking he would have told me that." *Id.* at 311:6-15; Ex. 113 at 7 ("MENTAL HEALTH – doing fine off meds, will d/c [discontinue] Zoloft order"). Mr. al-Kassar did complain of balance issues at his October 25, 2016, exam. Ex. 113 at 3. Dr. Pass explained that his diabetic neuropathy can affect balance. Tr. Vol. 2 at 316:16-317:3. Dr. Pass also noted that diabetic neuropathy can affect how someone perceives sensations of hot or cold on their bare feet. *Id.* at 316:24-317:1. Dr. Pass testified that he did not believe on October 25, 2016, that any heat and noise in the CMU SHU were the cause of Mr. al-Kassar's balance issues. *Id.* at 367:5-8.

While Mr. al-Kassar's glucose reading was 303 on October 25, *id.* at 311:19-312:1, Dr. Pass ordered blood work and later reviewed his A1C levels. *Id.* at 314:1-9; Ex. 113 at 6; Ex. 129 at 107-108. A patient's A1C most accurately measures a patient's blood glucose levels over time. Tr. Vol. 2 at 312:9-15, 315:17-20, 364:16-18. Mr. al-Kassar's A1C level (collected on November 1, 2016) was 6.7, lower than his March 2016 A1C of 8.2. *Compare* Ex. 110 at 1 (8.2 A1C)

*with* Ex. 129 at 108 (6.7 A1C); Tr. Vol. 2 at 315:6-10. Dr. Pass testified that this shows that Mr. al-Kassar's diabetic condition "significant[ly] improv[ed]" between March and October 2016 – which included the time he was in the CMU SHU. Tr. Vol. 2 at 315:6-10.

Mr. al-Kassar met with attorney Gail Gray in late October 2016. Ms. Gray testified that when she saw him at the USP Marion, it looked like he lost weight and had bags under his eyes. Tr. Vol. 2 at 290:17-24.[8]

While the evidence does not establish that Mr. al-Kassar had access every day he was in the SHU to every medication that he was prescribed, it does not show that he was denied necessary medical care. On the contrary, Mr. al-Kassar interacted with BOP medical personnel daily, was given and had access to prescription medications, and otherwise was provided medical care. Neither the initial medical screening on the day he arrived at USP Marion or the full medical exam conducted a week later revealed signs of lack of medical care, and Mr. al-Kassar did not make any complaints to health care staff at USP Marion about being denied medical care in the SHU at FCI Terre Haute. And again, Mr. al-Kassar's testimony about his medical care was inconsistent. He stated that he was never given his self-carry medications, yet he told his daughter that they

---

[8] Mr. al-Kassar also presented testimony from Reginald Falice, a fellow inmate at the USP Marion. Tr. Vol 1 at 150:25-151:5. Mr. Falice testified that Mr. al-Kassar had low energy and trouble walking around. *Id.* at 148:13-16, 149:17-18. But the Court does not give much weight to Mr. Falice's testimony because he lacks personal knowledge for any basis of comparison regarding his observations of Mr. al-Kassar's energy levels and the degree to which he was ambulatory. He has never been to FCI Terre Haute and had not met Mr. al-Kassar before he arrived at Marion. *Id.* at 150:25-151:5.

were delivered to him. The Court also credits Dr. Pass's testimony that Mr. al-Kassar did not present to him as someone who had not taken his medications for a month. Indeed, while Mr. al-Kassar has identified two times in which his glucose level was very high, his overall A1C had improved after his time in the SHU.

### H. Falls

Mr. al-Kassar testified that, because of the conditions in the SHU, he lost his balance and fell about three or four times when he was in the SHU. Tr. Vol. 1 at 45:1-4. He stated that these falls caused him back pain. *Id.* at 46:7-13. But Dr. Pass testified that Mr. al-Kassar did not tell him during his examination on October 25, 2016, that he had been injured while in the SHU. Tr. Vol. 2 at 325:10-16. In addition, Mr. al-Kassar's medical records also show that he has a degenerative back condition and has experienced medical issues with his back for over 20 years. Ex. 85 at 1 ("he had same [back pain] 25 years ago"); Ex. 110 at 4 (noting prescription for Naproxen for "low back pain"); Tr. Vol. 1 at 133:3-134:18. His records also show that he underwent surgery to his lumbar spine several years before he was incarcerated. Ex. 85 at 1; Tr. Vol. 2 at 323:11-23. And his medical records generally refer to his back condition as degenerative and arthritic. *Id.* at 324:7-19; 325:3-9.

Mr. al-Kassar's medical records show, and Dr. Pass testified, that Mr. al-Kassar did not experience any new symptoms related to his back beyond his preexisting chronic condition until April 2018 – about a year and a half after he was transferred from FCI Terre Haute. *Id.* at 323:5-324:6. Mr. al-Kassar

confirmed that he "did not tell [his] doctors about [his] severe back pain until April 2018." Tr. Vol. 1 at 136:9-12. And when he told medical personnel about a back problem in 2018, long after his stay in the SHU, Mr. al-Kassar explained that it was "new pain" and had "absolutely nothing to do with" "the SHU incident." *Id.* at 142:20-143:4. Mr. al-Kassar received a cane to help him walk in May 2018, after this new pain started. Ex. 129 at 453; Tr. Vol. 2 at 326:2-10. An MRI of his spine from July 23, 2018 shows degenerative changes consistent with arthritis. Ex. 87; Tr. Vol. 2 at 325:2-9.

Mr. al-Kassar also asserts that he suffered an injury to his hand because of his stay at the SHU. He testified that when he arrived at the USP Marion, he started feeling significant pain in his hand. Tr. Vol. 1 at 99:14-21. BOP medical records include a film in February 2019 of his right hand and note a history of a fall. Ex. 129 at 549. Dr. Pass testified that the x-ray shows an old, healed fracture as well as severe post-traumatic osteoarthritic changes, i.e., changes as a result of a trauma. Tr. Vol. 2, 352:4-353:6. While Mr. al-Kassar's 2019 x-ray indicates that his hand had been injured before, he has not presented sufficient evidence to connect this x-ray to any alleged injury in 2016. Indeed, Mr. al-Kassar testified that his hand started hurting when he arrived at USP Marion. Tr. Vol. 1 at 99:17-21. He did not testify that he experienced an incident at SHU that would have caused injury to his hand—rather he testified that his hand just started hurting upon arrival to the facility.

## II. Conclusions of Law

### A. Spoliation of Evidence

Mr. al-Kassar contends that the BOP failed to preserve key video evidence despite knowing that litigation was imminent.

The CMU SHU has cameras, which would have recorded interactions between Mr. al-Kassar and others in the SHU, al-Kassar's condition as he entered and exited his cell in the SHU, any paperwork that Mr. al-Kassar attempted to hand to BOP staff through the slot in his cell, and any signs that Mr. al-Kassar posted in view of the camera. Tr. Vol. 1, at 89:20, 212:14-23, 214:5-16, 248:21-249:3, 253:13-16. But the range of video cameras in the SHU does not include the inside of individual cells, including Mr. al-Kassar's. *Id.* at 225:25-226:1.

BOP Intelligence Research Specialist Evelyn Keller testified that BOP typically preserves SHU videotapes for 21 days unless she puts in place a hold request. *Id.* at 216:22-217:1, 227:19- 229:20; Ex. 92. BOP personnel would issue a hold request for video surveillance when an incident occurred, during an investigation, or if a preservation request was issued through the Courts or outside law enforcement. *Id.* at 234:17-21.

Mr. al-Kassar did not file a formal grievance (BP-9, with an attached BP-8) about the conditions at FCI-Terre Haute until February 23, 2017. Dkt. 193 at 15. Mr. al-Kassar filed a tort claim on the matter on February 26, 2018. Ex. 44 (2nd). These documents were submitted well beyond the BOP's 21-day retention policy.

Mr. al-Kassar bases his spoliation argument on a letter dated October 10, 2016, addressed to Warden Julian complaining of the conditions in the CMU SHU. Ex. 42. The parties agree that BOP scanned a copy of the letter into Mr. al-Kassar's electronic file on October 21, 2016. Ex. 92 at ¶ 9. And, at the *Pavey* hearing in this case, Mr. Swift testified that the letter, once scanned, should have been directed to the warden for a response, but Mr. Swift did not know whether it was. Ex. 128 at 95:7-24. Mr. al-Kassar contends that this letter put the BOP on notice that litigation over these allegations was imminent and the BOP, therefore, should have saved videos of the CMU SHU that would support his claims. In ruling on the defendants' exhaustion defense, the Court concluded that any letter submitted by Mr. al-Kassar did not initiate "the administrative remedy process because they were not received by the proper authorities." Dkt. 193 at 12, 15. Further, the Court had found that neither Warden Julian or Mr. Swift had seen the letter before this lawsuit was filed. *Id.* at 12.

A spoliation sanction is "proper only where a party has a duty to preserve evidence because it knew, or should have known, that litigation was imminent." *Trask-Morton v. Motel 6 Operating L.P.*, 534 F.3d 672, 681 (7th Cir. 2008). Before the Court can impose the sanction, the Court must also find that the destruction of materials was done in bad faith. *Id.*

Here, the October 2016 letter did not initiate the administrative remedy process, and there is no evidence establishing that, even though it was scanned into Mr. al-Kassar's file, it was reviewed by BOP personnel at that time. Mr. al-Kassar has therefore failed to show that any BOP officer knew or should have

known that litigation was imminent so that video of the SHU should have been preserved. And even if there were a factual basis to support a finding that the BOP had a duty to preserve video footage of the SHU, the evidence does not show bad faith of any BOP personnel. The Court concludes that no surveillance video was destroyed in bad faith, and a spoliation sanction is, therefore, not appropriate.

### B. Negligence

Under the FTCA, a negligence claim against the United States is governed by "the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). Thus, because the actions Mr. al-Kassar complains of occurred in Indiana, Indiana law applies. *See id.* To prove negligence under Indiana law, Mr. al-Kassar must establish: (1) a duty owed to him by the defendant; (2) a breach of that duty by the defendant; and (3) that the breach proximately caused the plaintiff's damages. *Caesars Riverboat Casino, LLC v. Kephart*, 934 N.E.2d 1120, 1123 (Ind. 2010).

The parties do not dispute that the BOP owed Mr. al-Kassar a general duty of care during his incarceration at the USP Terre Haute under 18 U.S.C. § 4042. This statute provides that the BOP shall "(2) provide suitable quarters and provide for the safekeeping, care and subsistence of all persons charged with or convicted of offenses against the United States, or held as witnesses or otherwise" and "(3) provide for the protection, instruction, and discipline of all persons charged with or convicted of offenses against the United States." 18 U.S.C. § 4042(a)(2)(3). While Section 4042 describes a general duty of care for

22

persons in federal custody, applicable state tort law—here, the law of Indiana— governs whether the duty was breached and whether the breach was the proximate cause of the plaintiff's injuries. *Molzof v. United States*, 502 U.S. 301, 305 (1992) ("[T]he extent of the United States' liability under the FTCA is generally determined by reference to state law.")

Mr. al-Kassar argues that BOP breached the duty of care by: (a) depriving him of medical treatment and ignoring his pleas for medical help; (b) not maintaining an adequate living facility in the FCI Terre Haute CMU SHU cell for al-Kassar, including the failure to provide an environment with adequate temperature control, sound levels, or sanitation; (c) only providing a few opportunities for him to shower, and even then, forcing him to re-dress in dirty, sweaty clothes after he showered; and (d) restricting his ability to contact his legal counsel, which may have resulted in relief for him sooner. He also contends that these breaches caused him multiple injuries.

As discussed above, the Court finds that the conditions where Mr. al-Kassar was housed in the SHU were not excessively hot, noisy, or unsanitary, or that he was denied necessary medical care. Thus, he has not shown that the United States breached its duty to provide him safe living conditions and medical care.  Given this finding, Mr. al-Kassar's ability to contact his legal counsel in a timely manner does not have any bearing on his FTCA claim.

The Court also finds that, even if the United States had breached its duties, Mr. al-Kassar has failed to show causation, that is, that any act by a BOP official caused his alleged injuries. Under Indiana law, "questions of medical causation"

23

are "question[s] of science necessarily dependent upon testimony by physicians or surgeons with experience in the area." *Armstrong v. Cerestar USA, Inc.*, 775 N.E.2d 360, 368 (Ind. Ct. App. 2002) (citing *Hannan v. Pest Control Servs., Inc.*, 734 N.E.2d 674, 679 (Ind. Ct. App. 2000)). While Mr. al-Kassar contends that the conditions in the SHU caused him a host of injuries, including back pain, impaired balance, injury to his hand, fear of death, severe symptoms of high glucose and high blood pressure, heat stroke, dehydration, extreme weakness, sleep deprivation, impaired sight, impaired hearing, impairment of mental faculties, and emotional trauma, he presented no expert testimony to support this conclusion. Indeed, when asked during his deposition what he thought caused his memory loss, Mr. al-Kassar replied, "This is a medical issue. I'm not a doctor."  Tr. Vol. 1 at 138:15-16; Ex. 125 at 70:24-25.

Mr. al-Kassar contends that the alleged dramatic change in his condition between when he was taken to the SHU and transferred to the USP Marion are enough to allow a lay person to conclude that the conditions he contends he experienced in the SHU caused his injuries. But, as the Court has already found, Mr. al-Kassar's testimony regarding his condition and the conditions of confinement at the SHU lacks credibility. Further, Dr. Pass, who saw Mr. al-Kassar after his transfer to the USP Marion, testified that Mr. al-Kassar did not present as someone who had not been provided medication or medical care in the past month. Tr. Vol. 2 at 311:6-15, 316:1-7. And, while Mr. al-Kassar contends that he fell several times while he was in the SHU, "[t]he mere allegation of a fall is insufficient to establish negligence, and negligence cannot be inferred

24

from the mere fact of a fall." *Taylor v. Cmty. Hosps. of Indiana, Inc.*, 949 N.E.2d 361, 364 (Ind. Ct. App. 2011) (quoting *Hall v. Eastland Mall*, 769 N.E.2d 198, 206 (Ind. Ct. App. 2002)).

In addition, Mr. al-Kassar had experienced back pain for many years, which he complained of becoming more severe nearly two years after his departure from the CMU SHU. Ex. 85 at 1; Ex. 110 at 4; Tr. Vol. 1 at 136:9-12. Because he had been experiencing back pain before his time in the SHU and that pain became more severe well after he left the SHU, he has not shown that his time in the SHU caused that pain. *Myers v. Illinois Cent. R. Co.*, 629 F.3d 639, 643 (7th Cir. 2010) ("But when there is no obvious origin to an injury and it has multiple potential etiologies, expert testimony is necessary to establish causation.") (internal quotation and citation omitted).

Mr. al-Kassar also states that BOP policy requires showers to be available daily and suggests that by not offering him a shower every day, and not allowing him to change into clean clothes, the BOP breached a duty to him. Ex. 83 at 6 (BOP Program Statement 5214.02). "[T]o satisfy the duty element of a negligence claim, a plaintiff must demonstrate that a defendant had a duty toward the plaintiff that arose either at common law or by statute." *Gresser v. Reliable Exterminators, Inc.*, 160 N.E.3d 184, 190 (Ind. Ct. App. 2020). It's unclear that the violation of BOP policy can create a mandatory duty. *Ates v. United States*, No. 2:21-CV-00418-JPH-MG, 2023 WL 1765991, at *7 (S.D. Ind. Feb. 2, 2023) (citing *Zimmerman v. Moore*, 441 N.E.2d 690, 696 (Ind. Ct. App. 1982)).

Regardless, he still has not shown that insufficient access to showers and/or fresh clothing caused him any injuries.

Because Mr. al-Kassar has failed to show that any negligent act on the part of BOP staff caused him injury, he is not entitled to relief on his negligence claim.

### C. Infliction of Emotional Distress

Mr. al-Kassar also alleges that the BOP's actions amounted to intentional infliction of emotional distress. A claim for negligent infliction of emotional distress has the same elements as a negligence claim: (1) duty; (2) breach; and (3) compensable damages proximately caused by the breach. *Cmty. Health Network, Inc. v. McKenzie*, 185 N.E.3d 368, 379 (Ind. 2022). But a negligent infliction of emotional distress claim also requires the plaintiff to show physical impact. *Id.* This is known as the modified impact rule. "For purposes of the modified rule, the direct impact sustained by the plaintiff must necessarily be a 'physical' one." *Atl. Coast Airlines v. Cook*, 857 N.E.2d 989, 996 (Ind. 2006) (quoting *Ross v. Cheema,* 716 N.E.2d 435, 437 (Ind. 1999)). Here, while Mr. al-Kassar alleges that he faced excessive heat and noise during his time in the CMU SHU, he has not proven that he suffered a direct physical impact from any BOP action. *See id.* (holding that breathing cigarette smoke and feeling floor vibrations caused by unruly airline passenger could not satisfy the modified impact rule).

Accordingly, he is not entitled to relief on his negligent infliction of emotional distress claim.

### D. Intentional Infliction of Emotional Distress

Finally, Mr. al-Kassar alleges that the BOP's actions constituted intentional infliction of emotional distress.

> The elements of intentional infliction of emotional distress are that a defendant (1) engages in extreme and outrageous conduct that (2) intentionally or recklessly (3) causes (4) severe emotional distress to another. *Id.* at 959–60. The requirements to prove this tort are rigorous. Intentional infliction of emotional distress is found where conduct exceeds all bounds usually tolerated by a decent society and causes mental distress of a very serious kind. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

*Bd. of Trustees of Purdue Univ. v. Eisenstein*, 87 N.E.3d 481, 500 (Ind. Ct. App. 2017) (internal quotations and citations omitted).

Again, while Mr. al-Kassar may have experienced some discomfort while confined in the CMU SHU, the Court does not credit his position that those conditions were synonymous with torture. Instead, the Court credits the testimony of BOP personnel and corroborating evidence showing that the SHU was not excessively hot or noisy or unsanitary and that Mr. al-Kassar was not denied medications and care that he needed for a month. Thus, Mr. al-Kassar has not shown that he was subject to conditions that "exceeds all bounds usually tolerated by a decent society." *Eisenstein*, 87 N.E.3d at 500. He therefore is not entitled to relief on his intentional infliction of emotional distress claim.

### III. Conclusion

Mr. al-Kassar has not shown that the United States was negligent in its treatment of him during his confinement in the CMU SHU at the FCI Terre Haute

from September 16, 2016 and October 19, 2016. He similarly has not shown that the United States subjected him to negligent or intentional infliction of emotional distress.

Judgment consistent with this conclusion, the Court's screening Order, dkt. [44], and the Entry Sustaining Affirmative Defense of Exhaustion, dkt. [193], shall now issue.

**SO ORDERED.**

Date: 9/28/2023

*James Patrick Hanlon*
James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

MONZER AL-KASSAR
61111-054
MARION
U.S. PENITENTIARY
P.O. BOX 1000
MARION, IL 62959

All Electronically Registered Counsel